**Raymond Edmund LaPOINT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 227–86.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 26, 1986.

On Rehearing May 4, 1988.

John H. Hagler (on appeal only), Dallas, for appellant.

Henry Wade, Dist. Atty. and Anne B. Wetherholt, Royce West and Terence Hart, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted of burglary of a building. Punishment was assessed by the jury at confinement in the Department of Corrections for 11 years and one day.

On appeal the Dallas Court of Appeals reversed the conviction due to a defective jury charge citing *Cumbie v. State*, 578

S.W.2d 732 (Tex.Cr.App.1979). *LaPoint v. State* (Tex.Cr.App. No. 05–84–0069 CR—1/4/85). We granted the State's Petition for Discretionary Review and remanded to the Court of Appeals for consideration of the error in the jury charge in light of *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1985), decided after the original opinion of the Court of Appeals.

On remand the Court of Appeals withdrew its original opinion and turned its attention to other grounds of error. In another unpublished opinion the Court of Appeals again reversed the conviction holding that the trial court, over objection, had erred in instructing the jury that "the act of breaking and entering a building at nighttime raises a presumption that the act was done with the intent to commit theft." *LaPoint v. State* (Tex.App.—Dallas—05–84–00669 CR—12/30/85). We again granted the State's Petition for Discretionary Review to determine the correctness of this second holding of the Court of Appeals.

Appellant was convicted as a party to the offense of burglary committed by co-defendant Shockley. V.T.C.A., Penal Code, § 7.02. The co-defendant was convicted in a separate trial, but his conviction was reversed on appeal on the same basis as appellant's. *Shockley v. State*, 695 S.W.2d 754 (Tex.App.-Dallas 1985) (Pet. granted—still pending). *Shockley* was cited as authority for the action taken by the Court of Appeals in its second opinion.

At the guilt stage of the trial the court charged the jury in part as follows:

"Our law provides that the act of breaking and entering a building at nighttime raises a presumption that the act was done with the intent to commit theft. Such presumption is rebuttable.

"You are further charged (a) that the facts giving rise to the presumption must be proven beyond a reasonable doubt; (b) that if such facts are proven beyond a reasonable doubt you may find that element of the offense sought to presumed exists, but you are not bound to so find; (c) that even though you may find the existence of such element, the State must prove beyond a reasonable doubt

each of the other elements of the offense charged; and (d) that if you have a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails, and you shall not consider the presumption for any purpose.

"So, in this case, before you may presume that Daniel Gaston Shockley, Sr. intended to commit theft, you must find from the evidence beyond a reasonable doubt that he had broken into and entered the building belonging to the complainant in the nighttime without the effective consent of the complainant, and if you have a reasonable doubt thereof, then the presumption fails and you will not consider such presumption for any purpose.

"If it is proven to you beyond a reasonable doubt that the said Daniel Gaston Shockley, Sr. did break and enter the building in question on the occasion in question at nighttime, Daniel Gaston Shockley, Sr.'s intent to commit theft may be presumed from these facts, but you are not bound to so find.

"Even though the existence of the intent to commit theft is found from the presumption raised by the facts stated in the preceedings (sic) two paragraphs, the State must prove to you beyond a reasonable doubt each of the other elements of the offense charged as well.

"If you have a reasonable doubt that Daniel Gaston Shockley, Sr. did in fact break and enter the building in question on the occasion in question at nighttime, then the presumption fails and you shall not consider the presumption for any purpose."

It is obvious that the trial court sought to charge in accordance with V.T.C.A., Penal Code, § 2.05.

Appellant objected and expressly pointed out that § 2.05 applied only to a presumption with respect to any fact established by the Penal Code itself "or another penal law" and that the "presumption" involved was not so established nor was such a charge authorized by case law. The objection was overruled.

Appellant was charged with burglary of a building under V.T.C.A., Penal Code, § 30.02(a)(1), which provides:

"(a) A person commits an offense if, without the effective consent of the owner, he:

"(1) enters a habitation, or a building (or any portion of a building) not then open to the public, *with intent to commit a felony or theft;* or...." (Emphasis supplied.)

■ Intent, as an essential element of the offense of burglary, must be proved by the State beyond a reasonable doubt; it may not be left simply to speculation and surmise. *Greer v. State,* 437 S.W.2d 558, 559–560 (Tex.Cr.App.1969). To find that burglary has been committed there must be evidence not only showing burglarious entry but also that the party at the time he entered had specific intent to commit theft or a felony as alleged in the burglary indictment. *Greer,* supra, at p. 560. Nothing in our burglary statutes or other statutes indicates that a presumption from the evidence arises with regard to proof of intent as an essential element of burglary. As a question of fact for the jury, however, intent may be inferred from the surrounding circumstances. *Mauldin v. State,* 628 S.W.2d 793, 795 (Tex.Cr.App.1982); *Ortega v. State,* 626 S.W.2d 746, 749 (Tex.Cr.App. 1982); *Moss v. State,* 574 S.W.2d 542 (Tex. Cr.App.1978); *Williams v. State,* 537 S.W. 2d 936 (Tex.Cr.App.1976); *Hawkins v. State,* 467 S.W.2d 465 (Tex.Cr.App.1971). See also *Wilson v. State,* 658 S.W.2d 615 (Tex.Cr.App.1983); *Goswick v. State,* 656 S.W.2d 68 (Tex.Cr.App.1983); *Coberly v. State,* 644 S.W.2d 734 (Tex.Cr.App.1983).

There, of course, is no question that a prosecutor may argue as a deduction from the evidence that intent to commit theft can be inferred from entry at nighttime without consent.

A number of cases have held that an entry made without consent in the nighttime is "presumed" to have been made with intent to commit theft. See *Mauldin v.*

*State,* 628 S.W.2d 793, 795 (Tex.Cr.App. 1982); *Solis v. State,* 589 S.W.2d 444, 446 (Tex.Cr.App.1979); *Moss v. State,* 574 S.W. 2d 542, 544 (Tex.Cr.App.1978); *Clark v. State,* 543 S.W.2d 125, 128 (Tex.Cr.App. 1970), and cases there cited. See also *Williams v. State,* 506 S.W.2d 868 (Tex.Cr. App.1974); *Clayton v. State,* 493 S.W.2d 526 (Tex.Cr.App.1973); *Roberts v. State,* 375 S.W.2d 303 (Tex.Cr.App.1964); *Alexander v. State,* 20 S.W. 756 (Tex.Cr.App. 1892). Although there may be some question as to whether this was a presumption or simply a permissible inference most of the cases applying the principle have done so in review of questions of sufficiency of the evidence. At the trial level the principle may come into play upon presentation of a motion for an instructed verdict or a hearing on a motion for new trial. Thus it has been a trial vehicle as well as an appellate vehicle to review the sufficiency of evidence. Cf. *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex.Cr.App.1985).[1]

The evidentiary "presumption" or permissive inference was never intended to relieve the prosecution of proving every element of a crime beyond a reasonable doubt or to be used in a jury charge for that purpose. *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985).

Only recently in *Browning v. State,* 720 S.W.2d 504 (Tex.Cr.App.1986), this Court held that instructing a jury on such "presumption" or inference was error and wrote:

"... In any given case the jury could make any number of reasonable inferences. But when the trial court, the only source of the law the jury has, picks out only one such inference and instructs the jury that that one, though rebuttable, is a presumption provided by law, the court gives the force of law to that one possible inference. In fact neither statute nor caselaw provides such a 'presumption' at the trial level. Instructing the jury that it does constitutes, in effect, a comment

---

**1.** Language in *Aguilar* that the inference of intent to commit theft arising from a non-consentual nighttime entry is intended solely for appellate consideration of sufficiency questions is too restrictive.

on the weight of the evidence. We do not hold that the jury may not make such an inference, nor that an appellate court in reviewing the sufficiency of the evidence may not assume that the jury made such a reasonable inference. The error lies in *instructing* the jury that they may apply such an inference." (Footnote omitted.) Also see *Mercado v. State,* 718 S.W.2d 291 (Tex.Cr.App.1986).

▪ There can be no question that the trial judge erred in overruling appellant's objection and charging on the "presumption" or inference to which V.T.C.A., Penal Code, § 2.05, was not applicable by its very terms and which was not authorized by case law. The charge was also an improper comment on the weight of the evidence. We thus agree with the Court of Appeals as to the error in the charge. We must now determine whether the appellant has suffered "some harm" as a result of the objected to error in the charge. *Almanza v. State, supra.*[2] The Court of Appeals did not expressly apply *Almanza* but cited *Shockley* as the basis for reversal. *Shockley* did discuss and apply *Almanza.*

Stuart Harris, owner of the Orchard Hill Pharmacy in Garland, testified that normal store hours were from 7 a.m. to 10:30 p.m. On October 27, 1982, he secured the store at the normal closing time and checked the locks. After midnight on October 28, 1982, he was summoned to the building which had been broken into and entered. Harris stated he had not given Daniel Shockley or the appellant LaPoint permission to break and enter his store. Harris did not testify that anything was taken from the store. On October 28 one of his employees found a walkie-talkie in the hardware section of the store which did not belong to the store. It was turned over to the police.

The record also shows that shortly after 12:00 a.m., Thursday, October 28, 1982, Garland Police Officer Bill Connaster was patrolling behind the Orchard Hills Shopping Center with his squad car lights off. As he pulled his vehicle from the back to the front of the strip shopping center, Connaster noticed a blue Ford van pull parallel to the walkway in front of the Orchard Hills Pharmacy. He observed a male, who was later identified as Daniel Gaston Shockley, exit the passenger side of the van, proceed to one of the doors at the front of the pharmacy, stoop slightly as if looking at the door handle, dip his shoulders with his hands forward, and then walk through the door. Because of the time of night, the reduced lighting inside the store, the absence of cars in the parking lot, the fact that Shockley was not carrying cleaning equipment and because of his experience as a police officer, Connaster believed a burglary was occurring. He called for backup. As the van pulled away, he followed, glancing into the pharmacy as he passed, seeing Shockley inside. After the van pulled from the shopping center parking lot onto West Kingsley Road, Connaster turned on his headlights and flashing lights, whereupon the vehicle turned back into the parking lot and stopped. Connaster testified he had not observed the driver commit any violation of the law. The officer approached the driver's side of the van and asked appellant, the driver of the van, for his driver's license. Appellant indicated he had none. Appellant was arrested.

In the meantime the backup officer, Steve Flanagan, arrived at the pharmacy.

---

**2.** In *Almanza,* we set out the standard of review for reversible error when a charge was properly objected-to, and then indicated to reviewing courts from what sources in the record before it, that they might make their determination of whether or not the error was reversible error. We said, in part:

"... If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than there must be some

harm to the accused from the error. In other words, an error which has been properly preserved by objections will call for reversal as long as the error is not harmless....

"... the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App.1985).

With his pistol drawn, the officer entered through a door from which the lock cylinder fell into his hand. Shortly thereafter he observed Shockley crouched down behind some shelves. Shockley was told to "freeze," whereupon he uttered, "I stayed in the building after it closed. I was looking for a pack of cigarettes and couldn't find anybody." Shockley was arrested.

Numerous items which were later introduced into evidence at the trial were seized from inside both the van[3] and the pharmacy. Significantly these included a pair of cutting pliers (which were retrieved from the van) whose bits were scientifically matched to the marks found on the lock cylinder which had been removed from the front door, a set of binoculars, a thermos, gloves, a police call radio directory which had marks next to the frequency of the Garland and several Dallas police stations, radio receiving crystals which matched the aforementioned frequencies, a radio scanner which accommodated the crystals, and numerous tools including some which had been filed, apparently to prevent scientific matching.

Appellant did not offer any evidence.

Since we have held that there is error in the jury charge and there was a timely objection to the charge on presumption, we must determine whether "some harm to the accused" has resulted from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1985). The degree of harm "must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

Appellant's guilt as a party to the offense was dependent upon the jury finding that Shockley had committed the alleged burglary with the intent to commit theft. By cross-examination appellant established

that the parking lot of the shopping complex was lighted until 2 a.m., that the pharmacy was lighted outside, and at least, in part, on the inside[4] at the time of the alleged offense, that a view of the interior was partially blocked by displays and merchandise and a person would have difficulty telling the pharmacy was not open for business. Further, it was shown that when Shockley entered he merely stooped slightly and walked through the door. There was no showing Shockley's fingerprints were on any of the tools, and he was not found in possession of any stolen property. Appellant asserted he was guilty of no offense and contested the issue that Shockley had the intent to commit theft. This was his argument to the jury. It is true that the prosecutor never referred to the presumption charge in his jury argument but did argue that given the time of the entry Shockley's intent must have been to commit theft. Assaying the degree of harm as directed by *Almanza*, we conclude, although it is a close question, that the giving of the jury charge on the presumption of intent to commit theft was harmful error "calculated to injure the rights" of the appellant. Article 36.19, V.A.C.C.P. Almanza v. State, supra.

The judgment of the Court of Appeals is affirmed.

TEAGUE, Judge, concurring and dissenting.

I agree with the majority opinion that the trial judge erred when he instructed the jury, over objection, that "the act of breaking and entering a building at nighttime raises a presumption that the act was done with the intent to commit theft." Therefore, I concur. However, given the facts that were presented to the jury, and viewing the charge as a whole, I am convinced beyond a reasonable doubt that such error did not have any impact whatsoever on the

---

3. Officer Connaster testified that after he learned over the police radio that Shockley had been arrested inside the store, he searched the van appellant had been driving.

4. Harris, the owner, testified at one point about one-fourth of the lights were on, but later stated this was only in the hardware section and that the lighting was reduced to about one-tenth at closing time. Another officer estimated about half the inside lights were on at the time.

jury's decision to find the appellant guilty. Therefore, I cannot agree with the majority opinion's holding to the contrary and must dissent.

This Court, however, should first address whether the Dallas Court of Appeals obeyed this Court's unpublished mandate that issued on October 16, 1985. See *La Point v. State*, Tex.Cr.App. No. 199–85. I find that it did not. This is another reason why I dissent.

Originally, the Dallas Court of Appeals, in an unpublished opinion, ordered the appellant's conviction reversed after it found that the charge contained fundamental error "[b]ecause the charge authorized the jury to convict appellant if they found him merely present at the scene of the offense ..." *La Point v. State*, (Tex.App.-Dallas, No. 05–84–00069 CR, January 4, 1985). This is different charge error from that which is singled out in this instance.

This Court thereafter remanded the cause to the court of appeals "for further proceedings consistent with our opinion in *Almanza* [*v. State*, 686 S.W.2d 157 (Tex. Cr.App.1985) ]."

However, the court of appeals never obeyed this Court's order; instead, it withdrew its prior opinion and wrote another opinion addressing the ground of error that concerns the erroneous instruction on the presumption, which is the issue before us at this time. It again reversed the appellant's conviction in another unpublished opinion. See *La Point v. State*, (Tex.App.-Dallas, No. 05–84,00069CR, December 30, 1985).

As a judge who sits on the highest appellate criminal court in this State, I find the failure of the court of appeals to follow this Court's mandate absolutely and totally shocking. I repeat what I stated in the dissenting opinion that I filed in *Garrett v. State*, 749 S.W.2d 784 (Tex.Cr.App.1986), (Now pending on State's motion for rehearing): "If this Court's express orders are not to be carried out by a court of appeals, then, pray tell, how can we expect our citizenry to obey *any* court's orders?"

Therefore, I first vote to remand this cause to the court of appeals for it to do what this Court ordered it to do on October 16, 1986. To the failure of this Court to enter such an order, I respectfully dissent.

In light of my past, and now well-known criticisms of *Almanza v. State*, supra, I should perhaps be in a state of merriment over how it is used in this cause to reverse the appellant's conviction. However, I am not gleeful; I am sad because "Almanza the Terrible" has prevented justice from being done in this cause. This cause, however, actually highlights and points out why *Almanza*, supra, should be quickly and expressly overruled by this Court before it needlessly devours more victims. In this instance, "Almanza the Terrible's" victim just happens to be the great State of Texas; tomorrow, though, it may be any number of defendants. It is truly a monster given birth and turned loose by this Court to devour innocent victims of this State. Hopefully, the great State of Texas will file a motion for rehearing stating all of the reasons why *Almanza*, supra, should be expressly overruled by this Court, and, also hopefully, a majority of this Court will then see the error of its ways when it created "Almanza the Terrible", grant the State's motion for rehearing and then expressly overrule *Almanza v. State*, supra.

I agree with the majority opinion that the trial judge in this cause erred in instructing the jury, over objection, on the presumption that "the act of breaking and entering a building at nighttime raises a presumption that the act was done with intent to commit theft." However, given the facts that were presented to the jury in this cause, and the entire jury charge, I am unable to agree that the error was sufficiently significant that it deprived the appellant of a fair trial or that it might have had a tendency to affect any rational trier of fact's decision to find the appellant guilty. The appellant's ground of error should be overruled and not sustained.

From the facts that Presiding Judge On-

ion sets out in his opinion for the Court,[1] only one inference can be drawn from those facts: But for the intervention by the police, the appellant and his co-defendant, who by the facts of this cause are obviously extremely sophisticated and skillful burglars, would have successfully burglarized the involved pharmacy; no doubt to obtain controlled substances rather than baby goods.

Although there is no question that the trial court erred, given the entire instruction that is set out on pages 181 and 182 of Judge Onion's opinion, I am unable to understand, like Ms. Anne B. Wetherholt, who represents the great State of Texas in this cause, how the error constitutes any harm, much less "some" harm. Given the entire instruction on the presumption, and viewing it in the context of the facts that were presented, I am also unable to understand how it was " 'calculated to injure the rights' of the appellant," as the majority opinion declares. See and cf. *Hall v. State*, 661 S.W.2d 101, 102–106 (Tex.Cr.App.1983). Also see *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *State v. Chambers*, 709 P.2d 321 (Utah 1985).

For the above and foregoing reasons, I dissent to the failure of this Court to remand this cause to the court of appeals for it to do what it was ordered to do on October 16, 1985; I concur in the holding that the charge was subject to the appellant's objection; I dissent to the holding that the error was reversible error.

McCORMICK and CAMPBELL, JJ., join.

### "APPENDIX A"

### FACT STATEMENT

Garland Police Officer Bill Connatser testified that about 12:10 a.m. in the early morning of Thursday, October 28, 1982, he was patrolling behind the Orchid Hills shopping center with his police vehicle's lights off. (R. III–124–126, 141; R. IV–178). He pulled alongside the walkway in front of a pharmacy located in the shopping center. (R. III–127). *See* State's Exhibit Nos. 3–12, photographs of the scene. While he was there he observed a light blue Ford van moving slowly pull up and stop near the front of the pharmacy parallel to the sidewalk. (R. III–128; R. IV–173). He observed a white male, Daniel Gaston Shockley, get out of the passenger side of that van after it stopped. (R. III–130, 184–185). The pharmacy had substantially reduced its lighting inside the store. (R. III–131). Shockley walked to one of the doors at the front of the pharmacy, stooped slightly as if looking at the door handle, dipping his shoulders with his hands forward, then walked through the door. (R. III–132; IV–123). Because of the reduced lighting and the absence of other vehicles in the parking lot of the pharmacy (R. III–136), the officer believed a burglary could be occurring. (R. III–133, 139–140). He called for backup. (R. III–137). After Shockley went inside the pharmacy, the van pulled off. (R. III–134–135). The officer followed it with his lights still turned off. As the van entered onto the roadway, West Kingsley Road, the officer turned on his driving lights as well as his red and blue police flasher. (R. III–137). The van stopped and turned back into the parking lot. The officer got out of his car and approached the driver's side of the van. (R. III–138). Appellant was the driver of the van. (R. III–141). The officer asked Appellant for his driver's license. Appellant did not have one; the officer asked Appellant for other identification; Appellant had no identification. (R. III–142, 159–160). Appellant was arrested and detained. (R. III–142, 160). At this point the jury was excused while the hearing occurred outside the presence of the jury. (R. III–142).

Upon receiving information over the police radio that police had one person in custody inside the pharmacy, the officer searched the van. (R. III–143–144). He

---

1. Although I do not have any quarrel with Presiding Judge Onion's summary of the facts of this cause, but because I find that Ms. Wetherhold has a done a better job in setting out the facts, I attach her summary to this opinion as "Appendix A".

heard what sounded like a police broadcast (R. IV–186–187), State's Exhibit No. 14, a plugged-in, operating radio apparatus, a programmable scanner was located behind the driver's seat and plugged in. (R. III–150–151, 174–175, 182). State's Exhibit No. 15, a Thermos, was on a seat behind the driver's seat. (R. III–151). State's Exhibit No. 16, a pliers or pinchers, was lying on the floor of the van behind the driver's seat. (R. III–152). Scientific comparison showed it was that *pliers which made the marks on the cylinder removed from the lock.* (R. IV–101–103). State's Exhibit No. 17 was a case containing a pair of binoculars. State's Exhibit No. 18, an operational four-channel radio frequency scanner, using crystals and bearing the frequency numbers 155.370, 460.375, 460.075 and 460.-425, was on the floor behind the driver's seat near the cover for the engine between the driver's and passenger's seat. (R. III–153–154, 176–179). It would have been possible to see it before he began to search. He did not remember if he actually saw it before he searched, but he did hear it. (R. III–155, 159). State's Exhibit No. 19 was a small pen light bearing black electrician's tape found near the scanner. (R. III–155–156). State's Exhibit No. 20 was a converter, to convert DC power to AC, found on the floor near the scanner. (R. III–156–157, 180). State's Exhibit No. 21 was a Yaesu brand programmable radio transmitter with microphone and receiver, found plugged in, operational, on the floor of the vehicle immediately behind the front seats on the floor just behind the engine cover, where someone only had to reach down to get it. (R. III–157, 181; IV–198–199; V–144–145).

When the officer walked up to the van, he had made the decision to arrest Appellant and detain him until an investigation could be made; make a temporary seizure of his body. (R. III–160). In addition to believing the pharmacy closed from the absence of cars outside and reduced lighting inside, he noted he did not see a broom, mop, cleaning pail or cleaning equipment indicating the person entering the pharmacy was part of a cleaning crew. (R. III–161–162).

Upon receiving the radio transmission that a man had been arrested in the store, he conducted a search of the van based on the written police policy that in every case prisoners' vehicles will be searched for inventory purposes to secure and protect their property. (R. III–163).

Also found inside the van later were State's Exhibits Nos. 81–105. (R. IV–3). State's Exhibit No. 81 was a Radio Shack police call radio directory which contained markings next to the frequency number for the Garland Police Department, 155.370. It matched the number on the crystal found in the van. There was also a mark by a frequency 460.075 which the book showed belonged to the Northeast Section of the Dallas Police Department, adjacent to the City of Garland, and a mark by frequency by 460.425, which the book showed to be the frequency for the Southeast Subsection of the Dallas Police Department. The van also contained crystals for these frequencies. (R. IV–13–18). The antenna belonging to the radio inside the van was also located inside the van. (R. IV–18). State's Exhibits Nos. 91–99 were found inside the blue bag, which was located in the van. (R. IV–21). State's Exhibits Nos. 100–106 were also items found inside the van. (R. IV–23).

The police scanner was plugged into the converter and the converter had wires leading from it up under the dash to the cigarette lighter plug. (R. III–165). (The scanner contained crystals to receive frequencies 155.370, 460.375, 460.075, 460.425 and State's Exhibit No. 81 also found in the van showed police frequencies for Dallas and Garland). (R. IV–12–18). State's Exhibits Nos. 85, 86, 87, 88 and 89 were maps. (R. IV–20).

State's Exhibit No. 101 was a *stapler found inside the van* (R. IV–24). Police processed it, among other things, for latent fingerprints. (R. IV–25). Prints taken from the stapler were put on State's Exhibit No. 108. (R. IV–27). *Those prints belonged to Daniel Shockley.* (R. V–13–16, 32–33).

The trial court overruled Appellant's objection to the admission of State's Exhibits Nos. 4–21. (R. III–166–169, 173). Other items subsequently recovered from the van, State's Exhibit Nos. 81–105, were also admitted over Appellant's objection. (R. IV–3, 12).

Officer Steve Flanagan testified that, when he approached the door of the pharmacy, the cylinder lock in the door had been taken out but was placed back into it to appear as if it had not been removed. It fell out when he touched the handle. (R. V–41). A reasonable person would have known the building was closed because there were no cars in front of the building, the light inside was lower than usual, and a normal person would have noticed that there was no one inside the building. (R. V–43). When he went inside the pharmacy, he observed a white male crouched down behind some shelves. (R. V–45–46). He ordered the man to "Freeze." (R. V–48). Although the man, Daniel Shockley, told the officer that he had stayed in the building after it closed and that he was looking for a pack of cigarettes, numerous tools were found inside the pharmacy. (R. V–49–51). Inside the pharmacy the officer found a padlock had been knocked off the back door. Lying in front of the door was a green knapsack with assorted tools in it. A pry bar tire tool and a glove were lying nearby. (R. V–54, 102). Based on his experience, these were the types of tools used in burglaries. (R. V–102–103).

A few days later the owner of the pharmacy found a walkie-talkie inside the pharmacy. It did not belong to him and he took it to the Garland Police Department. (R. V–107–108). *That walkie-talkie bore the brand name "Yaesu" as did the radio transmitter/receiver, State's Exhibit No. 21, which was found in the van Appellant was driving.* (R. V–144–145, 181).

Jackie Waggoner, an investigator for the Garland Police Department, testified that in his experience investigating building

burglaries, the tools contained in State's Exhibit No. 36, the canvas knapsack, were the type of tools used in burglarizing places. (R. V–173–176). Found inside the canvas knapsack, which was found inside the pharmacy, State's Exhibit No. 36, were State's Exhibits Nos. 37–80 and 109–111 with the exception of State's Exhibit No. 57, the padlock, and State's Exhibits Nos. 39, the tire tool and State's Exhibit No. 66, the gloves, which were found inside the pharmacy near the bag. (R. IV–9–11). State's Exhibits Nos. 75–80 found in the knapsack and 109–110 found in the van were drill bits. (R. IV–11).

## "ADDITIONAL SUMMARY OF THE FACTS"

The State suggests the following evidence, *by itself, separate and apart from the presumption,* reasonably permits the inference that Appellant's *intent was to commit theft:*[5] The owner of the pharmacy testified he closed it at 10:30 p.m. (R. III–25). The regular doors were all locked with standard cylinder locks when he left that night. One door was permanently closed (R. III–29); that door back by the pharmacy was padlocked. (R. III–30–32). It was locked on the inside so it could only be removed by someone on the inside. (R. IV–95). See pictures, State's Exhibits Nos. 24, 26. When closed the store had one-fourth to one-fifth regular lighting. (R. III–32). Garland Police Officer Steve Flanagan testified that he arrived at the pharmacy within 15–20 seconds after Officer Connatser had spotted what he reasonably believed to be a burglary (because in addition to the late hour, there were no cars in the parking lot, the lights inside were dimmer than normal and there was no one inside the pharmacy). (R. V–43). Connatser had called for back up about 12:10 a.m. (R. III–141; V. 56). Flanagan noticed the cylinder lock in the door had been

5. This is in addition to the evidence summarized in the Fact Statement above and discussed by the State in its previous petition before this Court to show beyond a reasonable doubt that Appellant was the lookout-man and get away driver aiding Daniel Gaston Shockley, the person who entered the building, to make Appellant liable as a party under TEX.PENAL CODE ANN. §§ 7.01 and 7.02 (Vernon 1974).

*pried out,* then put back so as to appear undamaged and undisturbed. But, when he *touched* the door to pull it open, the cylinder, State's Exhibit No. 34A, *immediately* fell out in his hand. (R. V–40–42). Expert scientific testimony showed that the pliers that made the marks on the cylinder were from the pliers found in the *van* Appellant was driving. (R. VI–101–103).

Since Shockley quickly entered in the pharmacy less than a minute before, *unless he knew* it was that way, it would have come off in his hand also. It had been in this condition from their *earlier tampering.* Then they replaced it in the door to appear undamaged, and left briefly to watch to see if police had been alerted. That Flanagan observed Shockley quickly enter without the cylinder coming out in his hand—because he did not take enough time to replace it neatly in the lock and it was not set on the nearby ledge as Flanagan had to do—meant Shockley *knew* the cylinder had deceptively been put back in the lock to avoid detection. This was one circumstance from which the culpable intent could be inferred. After entering the pharmacy Flanagan went around back of some shelves to see if he could see anything. (R. V–44). He observed a white male (Shockley) in an aisle between aisle shelves *crouched down* trying to look around the corner of the shelf towards the front of the store. (R. V–45–47, 51). Officer Flanagan told Shockley to freeze. (R. V–48). Shockley stated, "I *stayed* in the building after it *closed.*" (R. V–49). "I was looking for a pack of cigarettes and couldn't find nobody." (R. V–50). This res gestae statement, which is contrary to the fact that Officer Connatser saw Shockley enter the building barely a few *minutes* earlier when the store was obviously closed. (R. III–130–136). (Connatser called for backup when he saw Shockley enter the store;

Flanagan got there in 20 seconds). (R. III–137; V–56). It is a statement whereby Shockley attempted to deceive Officer Flanagan and indicates his consciousness of guilt—another circumstance showing he entered with a culpable intent.

Upon examination of the pharmacy Officer Flanagan discovered a padlock had been knocked off the back door. Lying next to the door was an *open* green knapsack, State's Exhibit No. 36, with assorted tools, State's Exhibits Nos. 37–80 (except for State's Exhibit Nos. 39, 57, 66). (R. IV–9–10).[6] A pry bar/tire tool, State's Exhibit No. 39, was lying outside it (R. V–54, 77) and gloves, State's Exhibit No. 66, next to it (R. IV–81). See pictures, State's Exhibit No. 26. Such a pry bar/tire tool is frequently used to gain entrance in burglaries. (R. V–103). The tools found inside the knapsack could be used to commit burglaries and/or break into safes. (R. IV–85; V. 175–176). The *redundancy* of tools in the bag indicates the person using the tools would have an *immediate* need for replacements if one failed to do the job (because of the hour and/or the lack of time to leisurely complete the job for fear of being discovered). The tips of several of the tire tools/lug wrenches and screwdrivers had freshly honed; such is not normally done if one is merely using it to change a tire. (R. IV–177–179). The purpose of this in a burglary is to eliminate any tool marks that might otherwise be left on the point of entry and scientifically traced to a particular tool. (R. V–179). Moreover, the next day a pharmacy employee found a Yaesu walkie-talkie in the store; this was a brand the pharmacy did not sell. (R. III–44–45, 87). It was the same brand as the transmitter/receiver, State's Exhibit No. 21, found in the van which Appellant was driving. (R. V–180–181). The plethora of *professional burglars tools* found *in and*

---

**6.** State's Exhibit No. 37, extension cord; No. 38 tire tool; No. 40 drill; No. 41 hammer; No. 42 hatchet; No. 43 pry bar; No. 44 hammer; No. 45 screwdriver; No. 46 pliers; No. 47 screwdriver; No. 48 pick; No. 49 vise grips; No. 50 handle; No. 51 screwdriver; No. 52 screwdriver; No. 53 screwdriver; No. 84 screwdriver; No. 55 tire tool; No. 56 pliers; No. 58 punch; No. 59 battery; No. 60 screwdriver; No. 61 bolt; No. 62 bag; No. 63 bag; No. 64 bag; No. 65 pair of gloves; No. 67 plastic garbage bag; No. 68 plastic garbage bag; No. 69 plastic garbage bag; No. 70 plastic garbage bag; No. 71 plastic garbage bag; No. 72 plastic garbage bag; No. 73 instruction booklet; No. 74 bottle of oil; No. 75 drill bit; No. 76 drill bit; No. 77 drill bit; No. 78 drill bit; No. 79 drill bit; No. 80 drill bit.

*around the open* bag near a door which could only have been unlocked from the *inside* after Appellant had quickly entered a different door whose cylinder lock *would have fallen out* in his hand if he did not know it had been deceptively replaced, in conjunction with the fact that the store was obviously closed because there were no cars in the lot, the lights inside were one fourth to one fifth dimmer and there was no one inside, and in conjunction with the fact police saw Shockley *enter* the store minutes before but he told Flanagan a story shown to be untrue—that he *stayed* in the store after it *closed* (at 10:30 and it was now after midnight) but couldn't find nobody (obviously, since it was closed) to get some cigarettes (from whom would he buy them if the store was closed? Was he really saying he was going to steal them?) —provide a multitude of circumstances from which intent to commit theft could be inferred beyond a reasonable doubt."

## OPINION ON STATE'S MOTION FOR REHEARING

Raymond Edmund LaPoint, hereinafter appellant, was the driver of a van, equipped with sophisticated communications devices capable of intercepting police broadcasts, who transported one Daniel Gaston Shockley and a variety of implements, of a kind routinely used to commit burglary, to the front entrance of a pharmacy, locked and not then open for business, shortly after midnight. Shockley exited the van and entered the pharmacy. Appellant drove away, but was apprehended moments later and returned to the scene, where Shockley was discovered inside the building. Both

were placed under arrest and charged with burglary. A jury convicted appellant of the alleged offense pursuant to an available statutory theory of complicity,[1] and assessed his punishment at confinement in the Texas Department of Corrections for a term of 11 years and a day.

On appeal the Dallas Court of Appeals reversed the conviction due to a defective jury charge, citing *Cumbie v. State*, 578 S.W.2d 732 (Tex.Cr.App.1979). *LaPoint v. State* (Tex.App. 05–84–0069–CR, 1/4/85). We granted the State's Petition for Discretionary Review and remanded to the Court of Appeals for consideration of the error in the jury charge in light of *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985), decided after the original opinion of the Court of Appeals.

On remand the Court of Appeals withdrew its original opinion and turned its attention to other grounds of error. In another unpublished opinion the Court of Appeals again reversed the conviction, holding that the trial court, over objection, had erred in instructing the jury that "the act of breaking and entering a building at nighttime raises a presumption that the act was done with intent to commit theft." *LaPoint v. State* (Tex.App. 05–84–00669–CR, 12/30/85). We again granted the State's Petition for Discretionary Review to determine the correctness of this second holding of the Court of Appeals.

On original submission, a majority of this Court affirmed the Dallas Court of Appeals, holding that a jury charge, drawn pursuant to V.T.C.A. Penal Code, § 2.05[2]

---

**1.** Appellant was convicted of burglary under the provisions of Penal Code, § 7.02(a)(2), which reads:

"(a) A person is criminally responsible for an offense committed by the conduct of another if:

. . . . .

"(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense;"

**2.** This statute provides:

"When this code or another penal law establishes a presumption with respect to any fact, it has the following consequences:

"(1) if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury, unless the court is satisfied that the evidence as a whole clearly precules a finding beyond a reasonable doubt of the presumed fact; and

"(2) if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption and the specific element to which it applies, as follows:

"(A) that the facts giving rise to the presumption must be proven beyond a reasonable doubt;

"(B) that if such facts are proven beyond a reasonable doubt the jury may find that the

and instructing that an intent to commit theft may be inferred from unlawful entry of a building at night, was erroneous and, under the circumstances of this case, harmful to appellant. We granted the State's motion for rehearing to consider whether our harm analysis on original submission was correct. After reconsideration, we have concluded that appellant did not, in fact, suffer any harm from the instruction.

The analysis prescribed by Art. 36.19, V.A.C.C.P.,[3] as authoritatively interpreted by this Court in *Almanza v. State*, supra, requires a determination by the reviewing court whether, in case objection was made to the charging defect at trial, the error "was calculated to injure the rights of defendant."

In *Almanza*, this Court held that Article 36.19, V.A.C.C.P. (1974),[ ] prescribes the manner in which jury charge error is reviewed on appeal. 686 S.W.2d at 171. Instead of automatically reversing convictions for technical charging errors, an appellate court must undertake a two-step process of review. First, an appellate court must determine whether error exists in the charge. Second, the appellate court must determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.* See *Jones v. State* 720 S.W.2d 535, 536 (Tex.Cr.App.1986).

The degree of harm that must be present to require reversal of a case depends upon whether the error was preserved or unpreserved. Concerning error that was preserved at trial by a timely and specific objection, that error must have been "calculated to injure the rights of [the] defendant." Article 36.19, V.A.C.C.P. (1974); *Almanza*, supra, at 171. In oth-

er words, a defendant must have suffered "some" actual, rather than theoretical, harm from the error. *Id.*

Presumably, this Court chose the term "some" to indicate the minimum degree of harm necessary for reversal of cases involving preserved charging error. However, that term was left undefined.[3] We now expressly find that, in the context of *Almanza*, supra, and Article 36.-19, supra, the presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm had occurred. See *Id.* at 171 ("In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.")

---

3. Strictly speaking, "some" indicates "an unknown, undetermined, or unspecified unit or thing." Webster's New Collegiate Dictionary 1107 (5th ed. 1977).

*Arline v. State*, 721 S.W.2d 348, 351 (Tex. Cr.App.1986).

It is the defendant's burden under Art. 36.19 to persuade the reviewing court that he suffered *some actual harm* as a consequence of the charging error. If he is unable to do so, the error will not result in a reversal of his conviction.

Under *Almanza*, supra, we examine the entire record of trial to determine whether appellant might have been acquitted, convicted of a lesser offense, assessed a more lenient punishment, or advantaged in some other significant manner, had the trial judge omitted from his jury charge the erroneous instruction on the presumptive effect of nighttime entry. Bearing upon

element of the offense sought to be presumed exists, but it is not bound to so find;

"(C) that even though the jury may find the existence of such element, the state must prove beyond a reasonable doubt each of the other elements of the offense charged; and

"(D) if the jury has a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails and the jury may not consider the presumption for any purpose."

**3.** This statute provides:

"Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 [V.A.C.C.P., relating to the trial court's charge to the jury] has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial."

this question is the character and quantum of evidence tending to indicate a larcenous intent, whether the objectionable instruction authorized inferences which would not otherwise have been available to the jury, the extent to which the instruction unduly emphasized the weight to be given selected evidence, and the manner or degree to which the instruction was exploited during final argument by the prosecutor.

The instruction here in question was a rather straightforward application of Penal Code § 2.05, supra, to evidence of nighttime entry. Accordingly, the jurors were informed that they might infer intent to commit theft from the mere fact of entry into a closed building at night. However, they were not required to make this inference and might have refused to do so even absent controverting evidence. Although the Penal Code refers to permissible inferences of this kind as "presumptions," it is worth noting that they are neither conclusive nor rebuttable in the ordinary sense. Juries are not required by law to treat the predicate fact as anything more than relevant evidence of the presumed or ultimate fact—something they would be entitled, and perhaps also obliged, to do even without aid of any presumption. Under § 2.05, the jury was equally free to ignore the significance of nighttime entry in passing upon appellant's intent, even if he had offered no other evidence of a nonculpable purpose. Cf. *Bellamy v. State*, 742 S.W.2d 677 (Tex.Cr.App.1987) (jury instruction constitutionally defective and harmful because it "never clearly informed the jury that it was free to reject the presumption").

The problem with giving a § 2.05 instruction in the instant context is that the Penal Code nowhere identifies the inference from nighttime entry to larcenous intent as a "presumption." Because § 2.05 expressly applies only "[w]hen this code or another penal law establishes a presumption," it clearly does not apply where, as here, the inference principally represents a means for appellate courts to sustain the sufficiency of evidence on the element of larcenous intent in a burglary prosecution. *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Cr.App.1985). The instruction is, there-

fore, erroneous not because it is false, but because the Penal Code does not expressly authorize it. Indeed, the instruction accurately describes a permissible inference which, if the jury opts to make it, will be held sufficient by an appellate court to prove larcenous intent.

However, and for the same reason, the giving of such an instruction when not expressly authorized by the Penal Code constitutes an impermissible comment upon the weight of evidence. *Browning v. State*, 720 S.W.2d 504, 508 (Tex.Cr.App. 1986). It tells jurors that the evidence they heard is legally sufficient for an affirmative finding upon one essential element of the alleged offense. This our law expressly forbids. See Art. 36.14, V.A.C.C.P.

Nevertheless, in light of the evidence actually adduced and the closing arguments actually made, we are unpersuaded that the accurate, albeit erroneous, instruction made any contribution to the jury's verdict whatsoever. Mental culpability must necessarily be proven, if at all, by circumstantial evidence. Where it is alleged that an accused entered a building with intent to commit theft, and not that he committed or attempted to commit theft, it is to be expected that no direct evidence of appropriation exists. The jury must, therefore, infer intent of the accused from the circumstances surrounding his entry. Although appellant, who was convicted for his complicity in this burglary, based his defensive argument upon the claim that his codefendant, Daniel Gaston Shockley, entered the pharmacy believing it to be open for business, virtually every circumstance relevant to the question militates against the plausibility of his claim. When discovered inside the store, Shockley was crouched behind a shelf in such manner as to suggest deliberate concealment. The store, although illuminated somewhat by interior lighting, was significantly dimmer than during normal business hours. No other persons, let alone pharmacy employees, were then present, and Shockley's representations upon being apprehended that he had remained in the store after it closed were patently false in light of the fact that

one of the arresting officers had personally seen him enter the store only moments before. Indeed, the store had been closed for several hours when Shockley, by appellant's own reckoning, entered it. It is little wonder, quite apart from the fact of nighttime entry, that the jury found his defense utterly implausible.

Certainly, the possibility of mistake would have been theoretically more probable had Shockley entered the store during daylight hours. But, given circumstances of the instant cause, it seems certain that the jury would have convicted appellant anyway. Nighttime entry is a significant factor in determining criminal intent only because it tends to indicate a surreptitious purpose associated with criminality. When other circumstances fail to disclose such a purpose, the fact that conduct occurred under cover of darkness is sufficient to supply the deficiency. Here, however, no such deficiency existed. Appellant's purpose was made abundantly clear by the plethora of burglary tools surrounding Shockley in the store, the possession by appellant of communications devices and other tools linking him with Shockley in the store, the total absence of any indicia that the pharmacy was open for business at the time, the demeanor of Shockley when apprehended, and the lack of any plausible motive for entry under such circumstances except to unlawfully appropriate the property of another. Since the sufficiency of evidence to establish appellant's complicity is not challenged, his culpability is entirely dependent upon that of Shockley. In other words, if Shockley intended to commit theft from the pharmacy, appellant is responsible for such intent so long as he assisted Shockley in the manner prescribed by Penal Code § 7.02(a)(2).

Moreover, the prosecutor made very little of the nighttime entry during his summation to the jury. Naturally, he called attention to the circumstance, just as he would have been entitled to do even without benefit of an instruction from the trial judge. But of greatest importance, he made no attempt to exploit the instruction unfairly by arguing, for example, that the circumstance of nighttime entry should be given special significance under the law or that it had the judge's personal imprimatur. Rather, it formed the least of his argument that Shockley intended by his unlawful entry to commit the offense of theft. Thus, to the extent that the prosecutor's argument might have been persuasive to the jury upon this element of the crime, we are unable to conclude that it would have been any less so absent the erroneous instruction.

■ Having carefully examined the entire record of trial, we find that the appellant suffered *no actual harm* as a consequence of the erroneous jury instruction "presuming" intent to commit theft from unlawful entry at night. Under the standard of review mandated by Art. 36.19, V.A.C.C.P. and *Almanza v. State,* supra, appellant's conviction should not be reversed on appeal. Accordingly, the State's motion for rehearing in this cause is granted, the judgment of the Court of Appeals is reversed, and this cause is remanded to the Court of Appeals for consideration of appellant's points of error not yet considered by the Court.

ONION, P.J., and CLINTON and DUNCAN, JJ., dissent.