

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

---

**NO. 2-06-447-CR**

BYRON ORRICK OUTLAW                                           APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Byron Orrick Outlaw of murder and assessed his punishment at life confinement. In a single issue, Outlaw challenges the factual sufficiency of the evidence to support his conviction, arguing that the evidence is insufficient "to prove that [his] finger pulled the fatal trigger." We will affirm.

---

[1]  *See* TEX. R. APP. P. 47.4.

On February 27, 2006, Ervin Flint, Jr. was shot while he was in front of a residence located at 708 Eastside Drive in Wichita Falls. The bullet that struck Flint ruptured his aorta, killing him. Police discovered multiple spent shell casings at an automotive repair shop ("the garage") located about 130 yards from 708 Eastside Drive and a .30 caliber M1 carbine rifle in the trunk of a vehicle that was parked inside the garage. Investigators determined that the bullet that struck Flint and caused his death was fired from the .30 caliber rifle and that the spent shell casings found in the garage had been fired from the same .30 caliber rifle. Authorities indicted Outlaw for Flint's murder after further investigation, and a jury convicted him of the offense.

Outlaw concedes that the evidence is legally sufficient to support his conviction. He challenges only the factual sufficiency of the evidence as it pertains to identity.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the

2

evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations,

3

"particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

A person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003). A jury can infer knowledge or intent from the acts, conduct, and remarks of the accused and from the surrounding circumstances. *LaPoint v. State*, 750 S.W.2d 180, 182 (Tex. Crim. App. 1986); *Nazemi v. State*, 28 S.W.3d 806, 810 (Tex. App.—Corpus Christi 2000, no pet.). Specific intent to kill may be inferred from the use of a deadly weapon unless the weapon was used in such a manner that it was reasonably apparent that death or serious bodily injury could not have resulted. *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986).

An accused's guilt may be proved with direct or circumstantial evidence. *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). As fact-finder, the jury is entitled to draw reasonable inferences

4

from circumstantial evidence to ultimate facts. *Villani v. State*, 116 S.W.3d 297, 303 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Identity of a perpetrator can thus be proved by direct or circumstantial evidence; eyewitness identification is not necessary. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Couchman v. State*, 3 S.W.3d 155, 162 (Tex. App.—Fort Worth 1999, pet. ref'd).

The evidence shows that on February 27, 2006, Outlaw, a member of a gang known as "KEP," called Clifton Wiley, an acquaintance and former KEP member, and told Wiley that he was coming to visit him at his residence. When Outlaw arrived at Wiley's house in his blue 1997 Grand Marquis, he said that Raymond McKinney, a member of a rival gang known as the "Hoovas," had just shot at him. Orondae Malone, another member of the Hoova's, confirmed Outlaw's account of the shooting. He testified that he was at 708 Eastside Drive on February 27, 2006, with a number of other individuals, including McKinney, and that someone at that location had fired a few gunshots at a dark blue or green car, which he identified as belonging to Outlaw, when the car drove by.

After telling Wiley that McKinney had just shot at him, Outlaw said, "I got something that's going to make these niggers quit playing with me." Outlaw opened the trunk of his car, and inside of the trunk was a black guitar case

5

containing a rifle.  Wiley told Outlaw that the rifle "was going to get him 100 years," and Outlaw responded, "Well, whatever come with it, that's what come with it.  These niggers are going to quit shooting at me."

Outlaw and Wiley subsequently departed Wiley's residence, drove past 708 Eastside Drive, and ended up at another residence on Patterson.  Sometime along the way, Wiley picked up his vehicle, an "ivory clear coat" or yellowish colored Crown Victoria.  While at the Patterson residence, Outlaw received a text message from "Nikki," an individual who has "friendships" with both the KEP and Hoovas.  Outlaw called Nikki and ended up speaking with McKinney, Malone, or both.  After the conversation, Outlaw grabbed the rifle and said, "[T]his ain't got nothing to do with y'all.  This all on me . . .," entered his car, and left only to return ten or fifteen minutes later.  After Outlaw returned, Wiley told him that he had to leave, and Outlaw asked Wiley to drop him off at the garage, which Wiley did.

After dropping Outlaw off at the garage, Wiley proceeded on his way before deciding to turn around and return to the garage to warn Outlaw that he observed other gang members nearby.  Wiley parked his car so that the rear faced the garage.  As he opened the car door, he heard gunshots coming from behind him and ducked down.  According to Malone, who was at 708 Eastside Drive, gunshots were fired at that residence about twenty to thirty minutes

6

after Outlaw called Nikki and after Malone observed Wiley drive by nearby Spudder Park in his "yellow cream car." Malone, who was in front of the residence with McKinney and Flint, observed "quite a few" gunshots strike the house as he crawled in through the front door. After the shooting ended, Malone exited the house and saw Flint lying on the ground. Over at the garage, Outlaw, breathing hard and with nothing in his hands, came to Wiley's car, entered it, and told Wiley to drop him off at the Patterson residence. Flint died as a result of the single-entry gunshot wound that he sustained.

Jeanette Newman and Robert Perry testified that they were at Spudder Park on February 27, 2006, when they heard gunshots fired from the direction of the garage, which had one of its doors open. They observed a person exit the garage, close the door, and get into a yellowish colored car before the car drove off. Perry identified Outlaw as the person who exited the garage just after the shooting. According to Newman and the Wichita Falls police officer who responded first to the shooting, it was sunny, clear outside, and still light out when the shooting occurred.

Gary Van Cook, Jr. testified that Outlaw and Wiley stopped by his house on February 27, 2006, in Outlaw's blue Grand Marquis and that he observed a rifle in the back seat of Outlaw's car. Worth Culberson, who runs the garage where Wiley had dropped off Outlaw just before the shooting, testified that he

7

worked at the garage earlier that same day and that he had left open the trunk of a white car in the garage before leaving.

Officer Greg Burt testified that he assisted with the process of collecting evidence from the garage. Authorities found close to thirty spent .30 caliber shell casings at the garage as well as a .30 caliber carbine rifle in the trunk of the white car in the garage. Officer Siobian Callahan testified that she lifted a fingerprint from the trunk of the white car located in the garage and where the rifle was found and that the fingerprint matched Outlaw's fingerprint.

Officer Charles Casillas testified that the bullet that killed Flint and a bullet found at 708 Eastside Drive matched the .30 caliber rifle found at the garage. A forensic firearms examiner testified that the bullet that struck Flint and caused his death was fired from the .30 caliber rifle and that the spent shell casings found in the garage had been fired from the same .30 caliber rifle.

Outlaw argues that the jury's verdict is "clearly wrong and manifestly unjust" because the testimony of the State's witnesses is either "far-fetched," "potentially fraudulent," "unilluminating," or "explainable." Outlaw arrives at this conclusion by ignoring much of the evidence detailed above and by pinpointing particular portions of the witnesses' testimony in which defense counsel skillfully attempted to raise doubts about Outlaw's guilt. Outlaw stresses that Officer Wade "received at least two different stories which

8

indicated that someone other than [Outlaw] had shot at or had reason to shoot at [Flint]"; that Culberson testified that "many people would go to his garage to check [] the status of the roughly dozen cars that were being worked on at his shop at that time," thus implying that other people visited and had access to the garage; that the medical examiner did not testify as to who and why Flint was shot; that Malone had an argument on the phone with Outlaw, but that Malone "never suggested that he had personal knowledge of who shot [Flint], or why"; that Cook said "he saw [Outlaw] with a gun that *looked* like the gun that shot [Flint]"; that Detective Kelly Brunson, who assisted with the processing of 708 Eastside Drive, "provided testimony which established that one of the three eyewitnesses [Perry] . . . was wildly inaccurate as to his measurement of distances"; that Detective Burt "could not say how and under what circumstances the fingerprint came to be on the [white] car, or when" and that "there was—and is—no evidence that connects the fingerprint with the crime"; that Officer Callahan "was unable to say when or under what circumstances the fingerprint came to be" on the white car in the garage; that neither Newman nor Perry could identify Outlaw in a photographic lineup; that the firearms examiner could not say who fired the gun; that Newman had bad eyesight and had been "drinking"; and that Perry's estimation of the distance between him and the garage on the day of the shooting was incorrect. Outlaw

9

also points to evidence that Wiley wrote a few letters to the district attorney while incarcerated indicating his desire to testify for the State, illuminating the possibility that Wiley had an incentive to lie. Specifically, Wiley stated in a letter, "I need to get to my wife and five children[,] sir[.] Just tell me who and what you want[.]"

Outlaw's analysis and conclusions readily conflict with the factual sufficiency standard of review. As the State points out, Outlaw analyzes the testimony of the State's witnesses in isolation in order to arrive at his conclusion that the evidence is factually insufficient to support his conviction. The factual sufficiency standard of review, however, requires that we view all the evidence in a neutral light, favoring neither party. *Watson*, 204 S.W.3d at 414. Outlaw's analysis also disregards the requirement that we give deference to the jury's determinations, particularly those determinations concerning the weight and credibility of the evidence, and the jury's ability to draw reasonable inferences from circumstantial evidence to ultimate facts. *See Johnson*, 23 S.W.3d at 8–9; *Smith*, 56 S.W.3d at 744. The jury, as the sole judge of the credibility of the witnesses, was free to believe or disbelieve all or part of the State's witnesses' testimony. Having found Outlaw guilty, the jury apparently chose to believe much, if not all, of the State's evidence tending to show that Outlaw murdered Flint, and it was entitled to make reasonable inferences from

the circumstantial evidence. And finally, that much of the State's evidence is circumstantial does not in and of itself render the evidence factually insufficient; the State could have proved Outlaw's identity as Flint's murderer by direct or circumstantial evidence, and proof of Outlaw's identity through circumstantial evidence is not subject to a more rigorous standard than is proof by direct evidence, as both are equally probative. *See Earls*, 707 S.W.2d at 85; *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989).

The record demonstrates that the jury was rationally justified in finding beyond a reasonable doubt that Outlaw murdered Flint. Examining all of the evidence in a neutral light, favoring neither party, we hold that the evidence supporting Outlaw's identity as Flint's murder is not so weak that the fact-finder's determination is clearly wrong or manifestly unjust. Nor does the conflicting evidence—the evidence that Outlaw relies on—so greatly outweigh the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *See Watson*, 204 S.W.3d at 414–15, 417; *Johnson*, 23 S.W.3d at 11.

11

Accordingly, the evidence is factually sufficient to support Outlaw's conviction for murdering Flint. We overrule Outlaw's sole issue and affirm the trial court's judgment.


PER CURIAM

PANEL: HOLMAN, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: August 21, 2008

12