COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-194-CR

 

 

ARTHUR DENNIS GARCIA                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Arthur Dennis
Garcia appeals from his conviction and forty-five-year sentence for
murder.  In three points, he challenges
the legal and factual sufficiency of the evidence and the trial court=s denial of his request for a manslaughter instruction in the jury
charge.  We affirm.








Background Facts[2]

Appellant and a friend, Robert Bigler, went to Bobby Cherrnay=s house in the early morning hours of July 3, 2003 and assaulted
Cherrnay.  Cherrnay=s roommate found him dead later that morning.  Cherrnay=s body had numerous striped, bruising wounds on the right side and a
stab wound to the right buttock that had Abled out.@

The State
charged appellant with the capital murder of Cherrnay.  The indictment alleged that in the course of
committing or attempting to commit burglary of a habitation, appellant
intentionally caused Cherrnay=s death by striking Cherrnay with Aa golf club or other long thin object,@ by striking Cherrnay with his hand, by stabbing Cherrnay with an
object unknown to the grand jury, by shocking Cherrnay with a stun gun, or Aby a combination of striking, stabbing, and/or shocking . . . Cherrnay
in the manner or manners alleged@ in the indictment. 

Appellant pled not guilty,
and the case was tried to a jury.  The
trial court included instructions on the lesser-included offense of murder in
the jury charge, and the jury found appellant guilty of murder. 








Sufficiency Points

In his first
two points, appellant challenges the legal and factual sufficiency of the
evidence to prove that he intended to kill or seriously injure Cherrnay.  Specifically, appellant contends that
because the evidence showed that none of Cherrnay=s wounds would have been fatal by themselves, the evidence is
insufficient to show that appellant acted with intent or knowledge to cause
death or serious bodily injury.

Legal Sufficiency Standard of Review








In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the
evidence should be measured by the elements of the offense as defined by the
hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Bowden v. State, 166 S.W.3d 466, 470 (Tex. App.CFort Worth 2005, pet. ref=d).  Such a charge would be one
that accurately sets out the law, is authorized by the indictment, does not
unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik,
953 S.W.2d at 240.  The law as
authorized by the indictment means the statutory elements of the charged
offense as modified by the charging instrument. 
See Curry, 30 S.W.3d at 404.








The standard of review is the
same for direct and circumstantial evidence cases.  Burden v. State, 55 S.W.3d 608, 613
(Tex. Crim. App. 2001); Kutzner v. State, 994 S.W.2d 180, 184 (Tex.
Crim. App. 1999).  In a sufficiency
review, the jury=s inference
of intent is afforded more deference than the evidence supporting proof of
conduct.  Margraves, 34 S.W.3d at
919.  Circumstantial evidence of a
defendant=s guilty
knowledge is not Arequired to
meet the same rigorous criteria for sufficiency as circumstantial proof of
other offensive elements.@  Id. (quoting Brown v. State,
911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). In determining the legal
sufficiency of the evidence to show an appellant=s intent, and faced with a record that supports conflicting
inferences, we Amust presumeCeven if it does not affirmatively appear in the recordCthat the trier of fact resolved any such conflict in favor of the
prosecution, and must defer to that resolution.@  Matson v. State, 819
S.W.2d 839, 846 (Tex. Crim. App. 1991).

Factual Sufficiency Standard of Review








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d 417.

In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@ Johnson, 23 S.W.3d at 8. 
Thus, we must give due deference to the fact-finder=s determinations, Aparticularly those determinations concerning the weight and
credibility of the evidence.@  Id. at 9.








An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

The Charge








The trial court=s jury charge included instructions on (1) capital murder, as both a
principal and a party, by striking Cherrnay with a golf club, other long thin
object, or appellant=s hand Ain combination with stabbing . . . Cherrnay with an object unknown to
the [g]rand [j]ury@; and (2)
murder, as both a principal and a party, by either (a) intentionally or
knowingly causing Cherrnay=s death by striking Cherrnay with a golf club, other long thin object,
or appellant=s hand in
combination with stabbing Cherrnay with an object unknown to the grand jury;
(b) with intent to cause serious bodily injury, causing Cherrnay=s death by committing an act clearly dangerous to human life:  striking Cherrnay with a golf club, other
long thin object, or appellant=s hand; stabbing Cherrnay; or Aby a combination of striking and/or stabbing . . . Cherrnay@; (c) while committing or attempting to commit aggravated assault or
burglary of a habitation, causing the death of Cherrnay by committing an act
clearly dangerous to human life; or (d) while conspiring to commit a felonyCaggravated assault or burglary of a habitationCand in carrying out or attempting to carry out the conspiracy,
committing a felony by 1) intentionally or knowingly causing Cherrnay=s death by striking him with a golf club, other long thin object, or
hand in combination with stabbing him with an object unknown to the grand jury
or 2) with intent to cause serious bodily injury, committing an act clearly
dangerous to human life, as described above. 
The charge did not require the jury to differentiate among the different
methods of murder charged.  The judge also
charged the jury on the offense of burglary of a habitation, as both a principal
and a party. 

Applicable Law

Murder

Penal code section 19.02(b)
describes three different ways of committing murder:

(b) A
person commits an offense if he:

 

(1) intentionally or knowingly causes the death
of an individual;

 

(2) intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an
individual;  or

 








(3) commits or attempts to commit a felony, other
than manslaughter, and in the course of and in furtherance of the commission or
attempt, or in immediate flight from the commission or attempt, he commits or
attempts to commit an act clearly dangerous to human life that causes the death
of an individual.

 

Tex. Penal Code Ann. ' 19.02(b)
(Vernon 2003).  

Intent

Penal code section 6.03
defines the intentional and knowing mental states as follows:

(a) A person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.

 

(b) A person acts knowingly, or with knowledge,
with respect to the nature of his conduct or to circumstances surrounding his
conduct when he is aware of the nature of his conduct or that the circumstances
exist.  A person acts knowingly, or with
knowledge, with respect to a result of his conduct when he is aware that his
conduct is reasonably certain to cause the result.

 

Id. ' 6.03(a),(b) (Vernon 2003).








Intent can be inferred from
the acts, words, and conduct of the accused. 
Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), cert.
denied, 517 U.S. 1106 (1996).  It can
also be inferred from the means used and the wounds inflicted.  Womble v. State, 618 S.W.2d 59, 64
(Tex. Crim. App. [Panel Op.] 1981); Yanez v. State, 199 S.W.3d 293, 311
(Tex. App.CCorpus
Christi 2006, pet. ref=d).  Intent may also be inferred from acts
indicating a consciousness of guilt.  See
Claxton v. State, 124 S.W.3d 761, 766 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d); cf. Montgomery v. State, 810 S.W.2d 372, 396 (Tex. Crim.
App. 1991) (op. on reh=g) (noting
that appellant=s intent to
arouse and gratify his own desire could be inferred by his consciousness of
wrongdoing, as evidenced by his telling children not to reveal to anyone what
had happened).

Applicable Facts

The evidence at trial showed
that Cherrnay had been harassing and threatening Dawn Sellers, appellant=s girlfriend, who was pregnant with appellant=s child at the time.[3]  On the night of July 2, 2003, appellant and
Dawn, along with Bigler and another friend, went to Dawn=s brother Erik=s house to
swim.  While at Erik=s, appellant and Bigler discussed going over to Cherrnay=s house.  According to Erik, no
one talked about killing Cherrnay, just about talking to him.  At some point, Erik pulled appellant aside
and told him to go home, cool down, and not do anything. 








Nigel Renfro, an officer with
the Carrollton police department, testified that around 2:45 a.m. on July 3,
2003, he stopped a car that had been speeding and had also run a stop
sign.  Appellant, who was driving, was
very nervous, breathing heavily, and his hand was trembling.  Officer Renfro also noticed an abrasion on
appellant=s left
knuckle, small spots of blood on both hands, and what appeared to be mud on both
knee areas and on his shoes.  Appellant
told Officer Renfro that he got the abrasion from wrestling in his friend=s backyard. 

Appellant=s passenger, Bigler, had the same type of spots of what appeared to be
mud on his knees, and he had blood on his shirt and in the corner of his
mouth.  He also had small amounts of
blood on his hands.  He did not appear to
have any cuts or abrasions that would have caused the bleeding, and Officer
Renfro surmised that Bigler had been in a fight and that the blood belonged to
someone else.  Officer Renfro did not
believe that appellant and Bigler were being truthful, but he let them go after
writing appellant a ticket.

Later that morning, around 11:00
a.m., Cherrnay=s roommate
discovered him dead on the floor of his bedroom and called 911.  When paramedics arrived at the house at 11:21
a.m., rigor mortis and lividity[4]
had already set in.  Todd Youngblood, one
of the paramedics who responded, said that he suspected foul play because of
the state of Cherrnay=s room,
particularly the broken glass everywhere.








Officer Gary Allen Fernandez,
a detective, also investigated Cherrnay=s death.  When Officer Fernandez
arrived at the house, he knew immediately that Cherrnay had not died of natural
causes.  There was a large amount of
blood and broken glass on the bed and a broken acoustic guitar next to Cherrnay=s body.

Officer David Taylor, a crime
scene investigator, processed the scene. 
He found that the inside of Cherrnay=s bedroom window was broken and there was blood on a guitar stand in
the room.  Cherrnay=s body was on the floor. 
Although there was not much blood underneath Cherrnay=s body, there was blood on his back and legs.  Cherrnay had been stabbed in his right back
hip, and the blood had flowed down his legs. 
Thus, it appeared Cherrnay had been standing or sitting up while he was
bleeding.  Officer Taylor described long,
thin, bruising-type wounds on the right side of Cherrnay=s body, which to Officer Taylor, made it appear that someone had
beaten Cherrnay on the right side while he was lying on his left side.  Officers also found a watch in the room that
was later identified as appellant=s.








Dr. Daniel Konzelmann, the
medical examiner who performed the autopsy on Cherrnay, testified that he
determined Cherrnay=s death was
caused by Ablunt force
injuries with stab wound of buttock.@  According to Dr. Konzelmann,
upon his external examination of Cherrnay, he noted Aa number of injuries of different types@:  blunt force injuries,
scratches, a Asharp-force@ wound on the right buttock, and a Asharp-force, shaved-type@ wound on the left lower arm.[5]  Among these wounds were the striped wounds
observed by Officer Taylor, which Dr. Konzelmann described as Aa series of linear paired abrasions down the right side of the body,@ some of which were parallel to each other and some of which were at
angles to each other; in other words, some of the striped wounds crossed each
other.  Dr. Konzelmann counted
thirty-four of these type of wounds.  Dr.
Konzelmann opined that these wounds were caused by something long and
relatively thin that was probably rounded with no sharp edges.  He said that such wounds would be consistent
with being inflicted by the shaft part of a golf club as opposed to the head.  Dr. Konzelmann stated that these wounds by
themselves would not have been immediately life-threatening but that they could
have become more serious given time.  But
he also stated that these wounds could potentially be caused by a weapon
capable of causing death or serious bodily injury.  He also opined that these blunt-force
injuries, together with the stab wound, were the result of acts clearly
dangerous to human life. 








Dr. Konzelmann also found
about eight blunt-force wounds on the skin of Cherrnay=s head and scalp, a little bruise on his inner lip, a scratch on the
forehead, and a pair of one-eighth inch round abrasions over the right chest,
with a bruise in between and a tear in the muscle with some minor soft tissue
bleeding underneath the bruise. 

Dr. Konzelmann found the stab
wound on Cherrnay=s right
buttock.  According to Dr. Konzelmann,
the stab wound by itself was the result of an act clearly dangerous to human
life.  The stab wound Awasn=t all that
far@ from the striped wounds on Cherrnay=s right side; the stab wound was more toward the back, and the striped
wounds were more toward the side and front. 
The stab wound was in a V-shape, which usually indicates that when the
object was in the victim, it was turned or the victim turned.  This wound could have been caused by A[a]nything long and straight and sharp [and] thin.@  According to Dr. Konzelmann,
none of the evidence he received from the sceneCincluding pieces of glass and the guitar standCwas consistent with having caused that wound.      Dr.
Konzelmann believed that the shaved-type wound occurred after or very near
Cherrnay=s death because it bled minimally. 
The lack of bleeding meant that Cherrnay=s blood pressure had dropped significantly.








On cross-examination, Dr.
Konzelmann admitted that the blunt-force trauma injuries by themselves did not
cause Cherrnay=s
death.  He also agreed that he could not
tell whether the stab wound was caused intentionally or whether Cherrnay fell
on a piece of glass.  Dr. Konzelmann
agreed that some of the face and head wounds were consistent with being hit by
a fist.  He also stated that he could not
find where the stab wound had crossed any major blood vessels;[6]
he estimated that it took probably fifteen or twenty minutes for Cherrnay to Ableed out@ from the
stab wound. 

After an investigation led
police to appellant and Bigler, Investigator Jeremy Chevallier took appellant=s videotaped statement on July 9, 2003 at the police station.  The videotape was published to the jury at
trial. 








In the video, appellant
initially denied any involvement in Cherrnay=s death and gave a different explanation for the abrasions on his
hand.  However, after further
questioning, he told the police that he and Bigler drove to Cherrnay=s house around 2:30 a.m. on July 3, 2003 after leaving Erik=s house and dropping Dawn off at hers. 
Appellant and Bigler each had with them a golf putter from Dawn=s garage.[7]  According to appellant, he and Bigler took
the putters with them for protection because they did not know if Cherrnay=s roommates would be home.

Appellant and Bigler parked
two or three streets over from Cherrnay=s house and walked to it.  When
they arrived, they knocked on the door about eight times and then went around
the house to a back sliding glass door, which was open.  They looked around Afor a bit@ because
they did not know where Cherrnay was. 
When they opened up the door to Cherrnay=s bedroom, it was dark because the lights were off.  They said, ABobby,@ and he
raised up.

Appellant said that he and
Bigler went into the room at the same time and that everything happened
quickly.  According to appellant, his
putter hit the wall and snapped in half, so he dropped it and Awent straight for [Cherrnay=s] head.@  He also said that Bigler=s putter broke, but he did not know when.  Appellant admitted hitting Cherrnay in the
head five or six times with his fists and hitting him with a guitar.  He said that Cherrnay fought back and was
scratching and biting.








Appellant told the police
that he did not know what Bigler was doing during the assault because the room
was dark, but he said he remembers putting Cherrnay in a headlock and that
Cherrnay was trying to get up, but he was lying on top of him holding him
down.  Appellant also said that he did
not remember any glass breaking in the room.

When the assault was over,
appellant said that he got up and looked around the room for anything he could
pick up as evidence.  He and Bigler found
the putters they had brought.  Cherrnay
was facedown on the bed.  They told him
not to move or look at them, and he said, AYes sir, I won=t move.@  Appellant stated that there
was some blood on Cherrnay=s back but he did not notice any cuts; however, he also said that
Cherrnay was naked.

The two left the house
through the same sliding glass door and went to the parked car.  They threw out the putters somewhere between
Cherrnay=s house and Dawn=s house,
where they went afterward.  Officer
Renfro stopped them before they got to Dawn=s house.  After going to Dawn=s, appellant took Bigler home. 
Appellant later threw away the clothes he was wearing that night.








Investigator Chevallier
testified that appellant=s statements
on the video are inconsistent with the types of visible injuries inflicted on
Cherrnay because A[t]here
appear to be a lot more bruises than five or six@ on Cherrnay=s body.  Investigator Chevallier found it hard to
believe that appellant did not know what Bigler was doing during the assault Abased on the fact that there was one body, there was one person they
were fighting and hitting.  It would be
hard for me to believe that they didn=t know what each other was doing at the time.@ 

Investigator Chevallier also
stated that appellant=s statement
that he did not hear any glass breaking is inconsistent with photographs of the
scene because there were broken bottles on the bed and broken glass on the
floor and bed and around the room. 
According to Investigator Chevallier, appellant=s claim that he did not know about any stab wound was also
inconsistent because of the amount of blood and the actual wound on the
back.  Investigator Chevallier said that
from his experience, the wound looked like a puncture wound and could have been
made by either someone stabbing Cherrnay or by Cherrnay rolling around on a
piece of glass while fighting appellant and Bigler. 

Investigator Chevallier also
said that it would be improbable for one person to have made all the blows
attributable to a long, thin object such as a golf club because the bruises
from those blows were at different angles and looked like they were made from
opposite directions.  The majority of the
stripes were on one side of the body, but some of them intersected and
overlapped. 

 

 








Analysis

The Court of Criminal Appeals
has Along held that when the trial court submits a jury charge setting out
alternate means of committing an offense (or alternate ways to prove a specific
element), the evidence is sufficient to support a general verdict of guilty of
the statutory offense if the evidence is sufficient to prove any one of those
alleged means.@  Bagheri v. State, 119 S.W.3d 755, 761
n.5 (Tex. Crim. App. 2003).  Here,
appellant was charged with four different methods of committing murder as either
a principal or a party; he challenges only the sufficiency of the evidence to
prove intent to kill or cause serious bodily injury.  Specifically, appellant contends that because
each of Cherrnay=s injuries
alone could not have killed him and that because there is evidence that the
stab wound could have been accidentally inflicted, the evidence is
insufficient to show an intent to kill or seriously injure.








However, evidence of an
intent to kill is not necessary to uphold the jury=s verdict in this case.  The
medical examiner testified that the thirty-four striped wounds could have
become serious given time and that all of Cherrnay=s wounds were the result of someone committing an act clearly
dangerous to human life.  Accordingly,
whether any one of those wounds was the actual cause of Cherrnay=s death is irrelevant.  Cf.
Umoja v. State, 965 S.W.2d 3, 5-6 (Tex. App.CFort Worth 1997, no pet.) (holding that evidence was factually
sufficient to support murder conviction when appellant was one of several
people beating and kicking victim).  By
appellant=s own
admission, he and Bigler entered Cherrnay=s house without permission and assaulted him.[8]  Appellant even admitted to holding Cherrnay
down on the bed.  The jury was entitled
to disbelieve appellant=s statements
that he did not know what Bigler was doing during the assault and that he
dropped the putter he was carrying after it broke against the wall.  The nature and amount of wounds on Cherrnay=s body evidences an act clearly dangerous to human life.  Thus, the evidence is sufficient to support
the jury=s verdict under section 19.02(b)(3) of the penal code.








Moreover, we believe that
there is also sufficient evidence of appellant=s intent.  The sheer volume of
the wounds inflicted on Cherrnay and the fact that they were inflicted by some
type of object used as a weapon indicates intent.  Appellant=s prior planning of the assaultCwhich included taking the putters from Dawn=s garage, concealing his actions from Dawn, and parking several
streets away from Cherrnay=s houseCindicates
intent.  And, finally, the fact that
appellant and Bigler took and disposed of only the golf clubsCwhile leaving appellant=s watch behindCindicates a
consciousness of guilt, especially with respect to the use of those items
against Cherrnay.  See Claxton,
124 S.W.3d at 766; see also LaPoint v. State, 750 S.W.2d 180, 189 (Tex.
Crim. App. 1986) (holding that appellant=s attempt to explain his presence in closed store to officer showed
consciousness of guilt and, therefore, culpable intent).

Accordingly, we conclude and
hold, according to the appropriate standards of review, that the evidence is
both legally and factually sufficient to support appellant=s conviction for murder.  We
overrule appellant=s first and
second points.

Manslaughter Instruction








In his third point, appellant
contends that the trial court erred by refusing to include an instruction in
the charge on the lesser-included offense of manslaughter.  Specifically, in his videotaped statement,
appellant said that he did not intend to kill Cherrnay, that he only struck
Cherrnay five to six times with his hands, that appellant did not know what
Bigler was doing during the fight, and that Cherrnay was talking to them as
they were leaving.  According to
appellant, this evidence at least raised a fact issue on manslaughter.

Applicable
Law

We use a two-pronged test to determine whether a defendant is entitled
to an instruction on a lesser-included offense. 
Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert.
denied, 510 U.S. 919 (1993); Royster v. State, 622 S.W.2d 442, 446
(Tex. Crim. App. [Panel Op.] 1981) (op. on reh=g).  First, the lesser-included
offense must be included within the proof necessary to establish the offense
charged.  Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005);  Rousseau,
855 S.W.2d at 672-73; Royster, 622 S.W.2d at 446.  Second, some evidence must exist in the
record that would permit a jury to rationally find that if appellant is guilty,
he is guilty only of the lesser offense. 
Salinas, 163 S.W.3d at 741; Rousseau, 855 S.W.2d at
672-73; Royster, 622 S.W.2d at 446.

Appellant asked that the jury
be given an instruction on manslaughter under section 19.04 of the penal code,
which provides that A[a] person
commits an offense if he recklessly causes the death of an individual.@  Tex. Penal Code Ann. ' 19.04(a).  A person acts
recklessly when he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur.  Id. ' 6.03.   








Manslaughter is a
lesser-included offense of murder.  Cardenas
v. State, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000); Montgomery v.
State, 198 S.W.3d 67, 91 (Tex. App.CFort Worth 2006, pet. ref=d).  Thus, the first prong of
the Rousseau test has been met, and we must decide whether the record
contains some evidence that would permit a jury to rationally find that
appellant is guilty only of the lesser-included offense of manslaughter.  Rousseau, 855 S.W.2d at 672-73; Montgomery,
198 S.W.3d at 91.

For a defendant to be
entitled to a jury charge on manslaughter, the record must contain some
evidence that the defendant did not intend to kill and that the
defendant acted recklessly, i.e., that he consciously disregarded a substantial
and unjustifiable risk of death of which he was aware.  Tex. Penal Code Ann. ' 6.03; Kennedy v. State, 193 S.W.3d 645, 651 (Tex. App.CFort Worth 2006, pet. ref=d) (en banc) (op. on reh=g); see Munoz v. State, 932 S.W.2d 242, 245 (Tex. App.CTexarkana 1996, no pet.).

Analysis








Here, there is no evidence
that when appellant participated in the assault on Cherrnay, he was aware of
the risk of death but consciously disregarded it.  To the contrary, the evidence pointed to by
appellant shows that he did not appreciate the risk of death.  According to appellant, he hit Cherrnay only
five or six times with his fists; did not hit him with the putter or any other
long, thin object; and he did not know what Bigler was doing during the
assault.  Thus, there is no evidence
showing that appellant consciously disregarded a known risk of death of which
he was aware.  Therefore, we hold that
there is no evidence that would have permitted a jury to rationally find that
appellant was guilty only of manslaughter and that the trial court did not err
by refusing such an instruction.  We
overrule appellant=s third
point.

Conclusion

Having overruled appellant=s three points, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.4(b)

DELIVERED: March 1, 2007











[1]See Tex. R. App. P. 47.4.





[2]A
more detailed factual background is set forth in the discussion of appellant=s
first and second points.





[3]Dawn=s
mother convinced Dawn to report the harassment and threats to the police.





[4]The
pooling of blood in the part of the body lowest to the floor.





[5]It
appeared that a thin layer of skin had been removed from Cherrnay=s
arm.  Cherrnay was a tattoo artist and
had tattoos all over his body.  He met
Dawn when she went into the shop in which he worked to get a tattoo.





[6]Dr.
Konzelmann testified that it was a little surprising that someone would Ableed
out@ from
the stab wound based on its location. 
According to Dr. Konzelmann, it is possible that a Asomewhat
smaller-sized or a medium-sized@ blood vessel was cut that he
could not find and that if enough of them are cut, a wound such as the stab
wound could bleed briskly.





[7]Appellant
initially denied that he took anything with him to Cherrnay=s.  He said that when he and Bigler dropped Dawn
off at home, he told her he had to go to the bathroom; instead, he went to the
garage, took the putters, put them in his car, then went back inside as if he
had gone to the bathroom.





[8]       Section 30.02(a)(1) and (3) of the penal
code defines the offense of burglary as follows:

(a) A
person commits an offense if, without the effective consent of the owner, the
person:

(1)
enters a habitation, or a building (or any portion of a building) not then open
to the public, with intent to commit a felony, theft, or an assault; or

. . .
.

(3)
enters a building or habitation and commits or attempts to commit a felony,
theft, or an assault.

 

Tex. Penal Code Ann. '
30.02(a)(1), (3) (Vernon 2003).