COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-447-CR

 

 

BYRON ORRICK OUTLAW                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE 78TH DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

A jury convicted Appellant
Byron Orrick Outlaw of murder and assessed his punishment at life
confinement.  In a single issue, Outlaw
challenges the factual sufficiency of the evidence to support his conviction,
arguing that the evidence is insufficient Ato prove that [his] finger pulled the fatal trigger.@  We will affirm.








On February 27, 2006, Ervin
Flint, Jr. was shot while he was in front of a residence located at 708
Eastside Drive in Wichita Falls.  The
bullet that struck Flint ruptured his aorta, killing him.  Police discovered multiple spent shell
casings at an automotive repair shop (Athe garage@) located
about 130 yards from 708 Eastside Drive and a .30 caliber M1 carbine rifle in
the trunk of a vehicle that was parked inside the garage.  Investigators determined that the bullet that
struck Flint and caused his death was fired from the .30 caliber rifle and that
the spent shell casings found in the garage had been fired from the same .30
caliber rifle.  Authorities indicted
Outlaw for Flint=s murder
after further investigation, and a jury convicted him of the offense.

Outlaw concedes that the
evidence is legally sufficient to support his conviction.  He challenges only the factual sufficiency of
the evidence as it pertains to identity.








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414B15, 417; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the verdict.  Watson, 204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

A person commits murder if he
(1) intentionally or knowingly causes the death of an individual or (2) intends
to cause serious bodily injury and commits an act clearly dangerous to human
life that causes the death of an individual. 
Tex. Penal Code Ann. ' 19.02(b)(1), (2) (Vernon 2003). 
A jury can infer knowledge or intent from the acts, conduct, and remarks
of the accused and from the surrounding circumstances.  LaPoint v. State, 750 S.W.2d 180, 182
(Tex. Crim. App. 1986); Nazemi v. State, 28 S.W.3d 806, 810 (Tex. App.CCorpus Christi 2000, no pet.). 
Specific intent to kill may be inferred from the use of a deadly weapon
unless the weapon was used in such a manner that it was reasonably apparent
that death or serious bodily injury could not have resulted.  Godsey v. State, 719 S.W.2d 578, 580B81 (Tex. Crim. App. 1986).








An accused=s guilt may be proved with direct or circumstantial evidence.  Smith v. State, 56 S.W.3d 739, 744
(Tex. App.CHouston
[14th Dist.] 2001, pet. ref=d).  As fact-finder, the jury is
entitled to draw reasonable inferences from circumstantial evidence to ultimate
facts.  Villani v. State, 116
S.W.3d 297, 303 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d).  Identity of a perpetrator
can thus be proved by direct or circumstantial evidence; eyewitness
identification is not necessary.  Earls
v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); Couchman v. State,
3 S.W.3d 155, 162 (Tex. App.CFort Worth 1999, pet. ref=d).

The evidence shows that on
February 27, 2006, Outlaw, a member of a gang known as AKEP,@ called
Clifton Wiley, an acquaintance and former KEP member, and told Wiley that he
was coming to visit him at his residence. 
When Outlaw arrived at Wiley=s house in his blue 1997 Grand Marquis, he said that Raymond McKinney,
a member of a rival gang known as the AHoovas,@ had just
shot at him.  Orondae Malone, another
member of the Hoova=s, confirmed
Outlaw=s account of the shooting.  He
testified that he was at 708 Eastside Drive on February 27, 2006, with a number
of other individuals, including McKinney, and that someone at that location had
fired a few gunshots at a dark blue or green car, which he identified as
belonging to Outlaw, when the car drove by.








After telling Wiley that
McKinney had just shot at him, Outlaw said, AI got something that=s going to make these niggers quit playing with me.@  Outlaw opened the trunk of his
car, and inside of the trunk was a black guitar case containing a rifle.  Wiley told Outlaw that the rifle Awas going to get him 100 years,@ and Outlaw responded, AWell, whatever come with it, that=s what come with it.  These
niggers are going to quit shooting at me.@

Outlaw and Wiley subsequently
departed Wiley=s residence,
drove past 708 Eastside Drive, and ended up at another residence on
Patterson.  Sometime along the way, Wiley
picked up his vehicle, an Aivory clear coat@ or
yellowish colored Crown Victoria.  While
at the Patterson residence, Outlaw received a text message from ANikki,@ an
individual who has Afriendships@ with both the KEP and Hoovas. 
Outlaw called Nikki and ended up speaking with McKinney, Malone, or
both.  After the conversation, Outlaw grabbed
the rifle and said, A[T]his ain=t got nothing to do with y=all.  This all on me
. . .,@ entered his
car, and left only to return ten or fifteen minutes later.  After Outlaw returned, Wiley told him that he
had to leave, and Outlaw asked Wiley to drop him off at the garage, which Wiley
did.








After dropping Outlaw off at
the garage, Wiley proceeded on his way before deciding to turn around and
return to the garage to warn Outlaw that he observed other gang members
nearby.  Wiley parked his car so that the
rear faced the garage.  As he opened the
car door, he heard gunshots coming from behind him and ducked down.  According to Malone, who was at 708 Eastside
Drive, gunshots were fired at that residence about twenty to thirty minutes
after Outlaw called Nikki and after Malone observed Wiley drive by nearby
Spudder Park in his Ayellow cream
car.@  Malone, who was in front of
the residence with McKinney and Flint, observed Aquite a few@ gunshots
strike the house as he crawled in through the front door.  After the shooting ended, Malone exited the
house and saw Flint lying on the ground. 
Over at the garage, Outlaw, breathing hard and with nothing in his
hands, came to Wiley=s car,
entered it, and told Wiley to drop him off at the Patterson residence.  Flint died as a result of the single-entry
gunshot wound that he sustained.

Jeanette Newman and Robert
Perry testified that they were at Spudder Park on February 27, 2006, when they
heard gunshots fired from the direction of the garage, which had one of its
doors open.  They observed a person exit
the garage, close the door, and get into a yellowish colored car before the car
drove off.  Perry identified Outlaw as
the person who exited the garage just after the shooting.  According to Newman and the Wichita Falls
police officer who responded first to the shooting, it was sunny, clear
outside, and still light out when the shooting occurred.








Gary Van Cook, Jr. testified
that Outlaw and Wiley stopped by his house on February 27, 2006, in Outlaw=s blue Grand Marquis and that he observed a rifle in the back seat of
Outlaw=s car.  Worth Culberson, who
runs the garage where Wiley had dropped off Outlaw just before the shooting,
testified that he worked at the garage earlier that same day and that he had
left open the trunk of a white car in the garage before leaving.

Officer Greg Burt testified
that he assisted with the process of collecting evidence from the garage.  Authorities found close to thirty spent .30
caliber shell casings at the garage as well as a .30 caliber carbine rifle in the
trunk of the white car in the garage. 
Officer Siobian Callahan testified that she lifted a fingerprint from
the trunk of the white car located in the garage and where the rifle was found
and that the fingerprint matched Outlaw=s fingerprint.

Officer Charles Casillas
testified that the bullet that killed Flint and a bullet found at 708 Eastside
Drive matched the .30 caliber rifle found at the garage. A forensic firearms
examiner testified that the bullet that struck Flint and caused his death was
fired from the .30 caliber rifle and that the spent shell casings found in the
garage had been fired from the same .30 caliber rifle.













Outlaw argues that the jury=s verdict is Aclearly
wrong and manifestly unjust@ because the testimony of the State=s witnesses is either Afar-fetched,@ Apotentially fraudulent,@ Aunilluminating,@ or Aexplainable.@  Outlaw arrives at this
conclusion by ignoring much of the evidence detailed above and by pinpointing
particular portions of the witnesses= testimony in which defense counsel skillfully attempted to raise
doubts about Outlaw=s
guilt.  Outlaw stresses that Officer Wade
Areceived at least two different stories which indicated that someone
other than [Outlaw] had shot at or had reason to shoot at [Flint]@; that Culberson testified that Amany people would go to his garage to check [] the status of the
roughly dozen cars that were being worked on at his shop at that time,@ thus implying that other people visited and had access to the garage;
that the medical examiner did not testify as to who and why Flint was shot;
that Malone had an argument on the phone with Outlaw, but that Malone Anever suggested that he had personal knowledge of who shot [Flint], or
why@; that Cook said Ahe saw [Outlaw] with a gun that looked like the gun that shot
[Flint]@; that Detective Kelly Brunson, who assisted with the processing of
708 Eastside Drive, Aprovided
testimony which established that one of the three eyewitnesses [Perry]
. . . was wildly inaccurate as to his measurement of distances@; that Detective Burt Acould not say how and under what circumstances the fingerprint came to
be on the [white] car, or when@ and that Athere wasCand isCno evidence
that connects the fingerprint with the crime@; that Officer Callahan Awas unable to say when or under what circumstances the fingerprint
came to be@ on the
white car in the garage; that neither Newman nor Perry could identify Outlaw in
a photographic lineup; that the firearms examiner could not say who fired the
gun; that Newman had bad eyesight and had been Adrinking@; and that
Perry=s estimation of the distance between him and the garage on the day of
the shooting was incorrect.  Outlaw also
points to evidence that Wiley wrote a few letters to the district attorney
while incarcerated indicating his desire to testify for the State, illuminating
the possibility that Wiley had an incentive to lie. Specifically, Wiley stated
in a letter, AI need to
get to my wife and five children[,] sir[.] 
Just tell me who and what you want[.]@








Outlaw=s analysis and conclusions readily conflict with the factual
sufficiency standard of review.  As the
State points out, Outlaw analyzes the testimony of the State=s witnesses in isolation in order to arrive at his conclusion that the
evidence is factually insufficient to support his conviction. The factual
sufficiency standard of review, however, requires that we view all the evidence
in a neutral light, favoring neither party. 
Watson, 204 S.W.3d at 414. 
Outlaw=s analysis
also disregards the requirement that we give deference to the jury=s determinations, particularly those determinations concerning the
weight and credibility of the evidence, and the jury=s ability to draw reasonable inferences from circumstantial evidence
to ultimate facts.  See Johnson,
23 S.W.3d at 8B9; Smith,
56 S.W.3d at 744.  The jury, as the sole
judge of the credibility of the witnesses, was free to believe or disbelieve
all or part of the State=s witnesses= testimony.  Having found Outlaw
guilty, the jury apparently chose to believe much, if not all, of the State=s evidence tending to show that Outlaw murdered Flint, and it was
entitled to make reasonable inferences from the circumstantial evidence.  And finally, that much of the State=s evidence is circumstantial does not in and of itself render the
evidence factually insufficient; the State could have proved Outlaw=s identity as Flint=s murderer by direct or circumstantial evidence, and proof of Outlaw=s identity through circumstantial evidence is not subject to a more
rigorous standard than is proof by direct evidence, as both are equally
probative.  See Earls, 707 S.W.2d
at 85; McGee v. State, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989).

The record demonstrates that
the jury was rationally justified in finding beyond a reasonable doubt that
Outlaw murdered Flint.  Examining all of
the evidence in a neutral light, favoring neither party, we hold that the
evidence supporting Outlaw=s identity as Flint=s murder is not so weak that the fact-finder=s determination is clearly wrong or manifestly unjust.  Nor does the conflicting evidenceCthe evidence that Outlaw relies onCso greatly outweigh the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  See
Watson, 204 S.W.3d at 414B15, 417; Johnson, 23 S.W.3d at 11.

 

 








Accordingly, the evidence is
factually sufficient to support Outlaw=s conviction for murdering Flint. 
We overrule Outlaw=s sole issue
and affirm the trial court=s judgment.

 

PER CURIAM

PANEL: 
HOLMAN, DAUPHINOT, and GARDNER, JJ.

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED: 
August 21, 2008











[1]See Tex. R. App. P. 47.4.