

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1069-10

**CHRISTOPHER ROBERT GEAR, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TWELFTH COURT OF APPEALS
### ANGELINA COUNTY

COCHRAN, J., filed a dissenting opinion in which PRICE and JOHNSON, JJ., joined.

### O P I N I O N

I respectfully dissent. I would affirm the judgment of the Tyler Court of Appeals

which found that the evidence was legally insufficient to support a finding that appellant

"intended to commit a felony, theft, or an assault inside the house" when he broke a window

at the complainant's house.[1] I agree that there is ample evidence to support a finding that

---

[1] *Gear v. State*, No. 12-09-00226-CR, 2010 WL 1899645 (Tex. App.—Tyler May 12, 2010) (not designated for publication).

appellant was unlawfully trying to enter the complainant's house, but there is simply no evidence to show what appellant intended to do inside that home.  The majority states that "a fact finder could reasonably infer that appellant intended to commit theft when he attempted to enter the complainant's home through the broken window."[2]  This seems to me to be a "Don'cha know" standard; appellant broke the window and was about to climb inside, therefore "don'cha know" he intended to commit theft.   As the court of appeals explained,

> This is an unusual case in which there is no evidence that allows any inference about what Appellant intended to do within the house.  By a process of elimination, a rational trier of fact could conclude that Appellant's intentions were not honorable.  But we read *Laster* [*v. State,* 275 S.W.3d 512 (Tex. Crim. App. 2009)] to mean that while the factfinder's prerogative to choose among plausible and rational readings of the evidence is beyond our review, there must still be some evidence to prove the essential elements of the offense and a verdict must be supported by a reasonable inference.[3]

In *Brooks v. State,*[4] we jettisoned the unworkable "factual sufficiency" review because the single, *rigorous* due-process standard in *Jackson v. Virginia*[5] suffices to protect a defendant from conviction without sufficient proof of every element of the offense to satisfy the beyond-a-reasonable-doubt standard.[6]  I do not think that there is "adequate evidence"[7]

---

[2] Majority op. at 2.

[3] *Gear,* 2010 WL 1899645 at *5.

[4] 323 S.W.3d 893 (Tex. Crim. App. 2010).

[5] 443 U.S. 307 (1979).

[6] *Brooks*, 323 S.W.3d at 906 ("It bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is 'barely distinguishable' or indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard).") (plurality op.), 914 (the national body of law

to support, beyond a reasonable doubt, an inference of appellant's intent to commit theft from this record. Looking at all of the evidence in this case, even viewed in the light most favorable to the trial judge's verdict, I cannot find the evidence sufficient in quality, character, or weight under the rigorous *Jackson* standard.

## I.

Mona Stafford Brown testified that she lives in the foreman's house behind the Lufkin Livestock Exchange auction barn. It is an old wooden house in the corner of the parking lot. The auction barn was closed down, but Ms. Brown's husband is a caretaker for the property, although he works at the creosote plant. Her husband mows the property and patrols because "it's a lot of vandalism going on back there. It's a lot of people who like to sit around in the dark." She was taking a nap after lunch one day when she heard a "bunch of sounds." She thought it was her husband coming back from the creosote plant right behind the auction barn property.

---

implementing the *Jackson* legal sufficiency standard "is objective and intellectually rigorous. It sets out apellate presumptions, permissible inferences, and specific criteria to use when assessing the legal sufficiency of the evidence.") (Cochran, J., concurring).

[7] *See id.* at 917 (Cochran, J., concurring) (quoting BLACK'S LAW DICTIONARY 1285 (5th ed. 1979)).

> Legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." In criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. There is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*.

The rattling noise seemed to be coming from the side door which she and her husband had nailed shut because the porch "isn't that good out there" and they didn't want the grandchildren playing on it.  After a third "boom, boom, boom," Ms. Brown got up to look for her husband in the second, storage bedroom.  But as she turned the corner, she saw that the room, which should have been dark because a dark curtain covers the plexiglass window, had light streaming through it.  The curtain had fallen down.  The window was nailed shut in the winter, so Ms. Brown thought that maybe a tree limb had fallen through the window, so she went over to investigate.  "[A]nd then this young man stepped in the window.  I mean, like we were right here . . . .  And I just –I panicked.  I don't know. I said, 'What are you doing?' or something.  And he said something to the fact, 'I didn't do it' or something."  Ms. Brown said that the strange man "looked startled like he didn't know I was there.  Well, we didn't expect to see each other."  She thought that he was jumping in the window.  Then both of them took off in opposite directions.

Ms. Brown testified that while she ran out the front door, the strange man ran off through the abandoned auction barn field, "it's a big ole field out there with a bunch of troughs."  Shortly thereafter, her husband came home and looked around the auction barn, gates, and fences.  Then they got a call saying that a man had been stopped by an officer, so she went down the road to see if she could recognize him.  She did.  And the man immediately said, "Ma'am, I wasn't trying to break in your house."  She thought he had been eating candy because he had "incredibly pink lips."  Ms. Brown was then asked about

pictures the officer took of the nailed-up side door, the wood window frame with plexiglass which had been pushed out of the wall[8] and into a pile of Ms. Brown's shoes and purses,[9] and an aerosol can of oven cleaner discarded in the grass and leaves underneath the broken plexiglass window. The trial judge then asked Ms. Brown about the oven cleaner can and whether the officer had collected it. Ms. Brown did not know anything about a can of oven cleaner, but it wasn't there later.

Officer Rusty Pitts testified that he was dispatched to look for the strange man and found appellant, who matched the description of the man, about 2:00 p.m. coming out of the woods near the road. Appellant had a box cutter in his pocket. When Ms. Brown arrived, appellant immediately said, "I wasn't trying to break into your house." After investigating and taking photographs (including one of the oven cleaner can), Officer Pitts gave appellant a criminal trespass warning and let him leave. Appellant was later indicted for attempted burglary.

Appellant testified that he is twenty-six[10] and was working at D&J Roofing down the highway from the auction barn that January morning. He "ended up quitting and walking off the job" about noon. He started walking down the highway toward Lufkin. After he had

---

[8] The plexiglass had been caulked into the wooden frame for the winter.

[9] This room was used as Ms. Brown's closet as the "old house" did not have any closets.

[10] Appellant admitted that he had a prior robbery conviction, prior theft conviction and one for possession of hash. He did not go to prison, but was placed on probation and went to "rehab for drug abuse and smoking weed."

gone about two miles, he was getting hot and tired when he saw "what appears to be a pretty shabby abandoned house with trash in the yard," including a couch in the front yard.[11]  So he sat on the couch and fell asleep.  He said that, when he woke up, he urinated on the side of the house because he thought it was abandoned.[12]  He said that he was mad at himself and he "punched" the building, and then he heard a lady saying, "Are you trying to break into my house?" He said, "No.  There's no way I'm trying to break in your house right now."  And then he left and started walking down the highway.  He denied even seeing the oven cleaner can and denied being under the influence of anything.   He said, "I was shocked that there was even somebody living in that place as–well, what I assumed was nobody lived there because of the condition.  When somebody actually looked out of the building, that's when I was shocked."

He testified that he expected the police to come and arrest him because Ms. Brown "was scared that I was breaking in her house, and I understand that."  He explained that he had the box cutter with a hook blade on it because he used that for his roofing job.

The trial judge then asked appellant why he had quit his job, and he said that the roofing owner worked them "pretty hard and doesn't really pay that much"–$8 an hour. Then, after appellant had been working all morning, without a break, he finally got fed up and said,

---

[11] Ms. Brown was recalled and verified that there is an "old couch" without any cushions on it in her yard.  Bushes and "stuff" were growing up through it.

[12] He told Deputy Pitts that he had urinated by the corner of the house, but the officer did not see any evidence that appellant had done so.

"Man, I can't do this anymore, dude." And he left. When the judge asked him whether, when appellant had been sent to drug rehab, "huffing" had been involved, appellant said no and immediately volunteered, "The oven cleaner, I have no idea what that's about. I really don't." The trial judge then asked, "Do you have any explanation or had you been eating candy that would have caused your lips to be red and pink?" Appellant responded, "Possibly, yes. I mean, do they look like that now? I don't know."

In his closing arguments, defense counsel pointed out that there was no evidence of an intent to commit theft. And then came the following colloquy:

Judge:      When you have attempt, I don't think they have to prove that mens rea or the intent of what the underlying offense was, do you?

State:      I don't believe so, Your Honor.

Defense:    I would disagree. I think that you still had to prove what the intent was. Because this is specific intent to commit–

Judge:      It's not alleged. It's not an element as alleged.

Defense:    I understand; but I think when it says "with specific intent to commit burglary of a habitation," they have to show his intent was to commit that crime, which all of the elements of burglary of a habitation would have to be met. That's just my position, You Honor.

## II.

Defense counsel was correct. That is the law. In an attempted burglary prosecution, the indictment may read "with the specific intent to commit the offense of burglary of a

habitation."[13]   But the proof at trial must establish, beyond a reasonable doubt, that the defendant acted with the intent to commit theft, a specific felony, or an assault at the time he acted (here, when appellant broke Ms. Brown's window).[14]

It seems quite plausible that the trial judge in this case found appellant guilty because he incorrectly believed that the State was not required to prove that appellant attempted to enter Ms. Brown's house with the intent to commit a theft, specific felony, or assault.  It also seems that the trial judge reasonably concluded that appellant wanted to break into what he thought was an abandoned building to assuage and relieve his anger by "huffing" an aerosol container of oven cleaner.  That is certainly not an "honorable" purpose–indeed it is a criminal offense–but entering Ms. Brown's with an intent to "huff" is a Class B misdemeanor, not a theft, felony, or assault.[15]

Although the nonconsensual entry of a habitation at night creates a rebuttable

---

[13] *Young v. State*, 675 S.W.2d 770, 770-71 (Tex. Crim. App. 1984) (indictment alleging attempted burglary need not allege that he attempted entry with an intent to commit a particular felony or theft; "'Our courts have held that an indictment for criminal attempt is not fundamentally defective for failure to allege the constituent elements of the offense attempted.'"); *see also Epps v. State* 811 S.W.2d 237, 243 (Tex. App.—Dallas 1991, no pet.).

[14] *Solis v. State*, 589 S.W.2d 444, 446-47 (Tex. Crim. App. 1979) (evidence legally insufficient to support attempted burglary conviction when circumstantial evidence to establish intent to commit theft was his removal of outside screen; "We conclude that, although the circumstances show that appellant probably intended to enter the Alfred house with intent to commit theft, his behavior after removal of the screen was sufficiently inexplicable that reasonable doubt remains as to what his *specific* criminal intentions actually were.").

[15] *See* TEX. HEALTH & SAFETY CODE § 485.031 (setting out the Class B misdemeanor of using or possessing "an abusable volatile chemical" with the intent to use it (1) contrary to directions for its use and (2) to affect the nervous system, induce intoxication or change or distort eyesight, thinking, balance, or coordination).

appellate presumption that the actor intended to commit theft,[16] that presumption does not apply in this day-time event. Instead, as an essential element of attempted burglary, the State must prove the intent to commit theft (or any felony or assault) beyond a reasonable doubt; "it may not be left simply to speculation and surmise."[17] Or "Don'cha know."

As the court of appeals aptly noted, the State failed to point to any evidence in the record from which one could fairly infer that intent.[18]  The majority says that appellant lied and gave two implausible and inconsistent stories, therefore the evidence is sufficient to support a finding that he intended to commit theft.  Certainly lying is relevant, but I do not think it is sufficient to establish an intent to commit theft, any more than it is to establish an intent to commit murder, sexual assault, or any other possible offense.  And those inconsistent stories also support a finding, suggested by the trial judge, that appellant intended to "huff" because there was a can of oven cleaner left in the grass.  The majority also says that the intent to commit theft is a reasonable inference because appellant was "recently unemployed" (he walked off the job that morning) and he had only a dollar in his pocket.  I do not find it  reasonable to infer from the fact that someone had just quit his job

---

[16] *See LaPoint v. State*, 750 S.W.2d 180, 182 (Tex. Crim. App. 1986).

[17] *Id.*

[18] *Gear*, 2010 WL 1899645 at *4 ("Indeed, the State has not identified, either at trial or on appeal, what evidence supports the conclusion that Appellant intended to commit a felony, theft, or an assault within the house.").

and had only a small amount of cash in his pocket that he is about to commit theft.[19]  And the combined force of these circumstances–inconsistent stories, quitting his job, and not having much cash on him–do not suffice to prove, beyond a reasonable doubt, that appellant had the intent to commit theft when he broke out Ms. Brown's window.  Here, as in *Solis*, the actor's behavior was "sufficiently inexplicable that reasonable doubt remains as to what his *specific* criminal intentions actually were."[20]

In sum, I agree with the court of appeals that the fact that appellant told unbelievable and inconsistent stories about his actions at Ms. Brown's home makes him a liar as well as a trespasser, but it is not sufficient to create a reasonable inference that he intended to commit theft, assault, or some felony once inside her home.[21]  The court of appeals applied a properly rigorous sufficiency-of-the-evidence review under *Jackson*.  Having said that we would do the same in *Brooks*, I respectfully dissent to the Court's failure to follow its own admonition.

Filed: June 15, 2011
Publish

---

[19] The court of appeals rejected that suggestion and said
[W]e do not conclude, under the facts of this case, that Appellant's lack of money allows an inference that he intended to commit a theft.  His testimony about a lack of funds came in the context of a discussion about his general frustration with having walked off his job and with being hot, sweaty, and tired.  Without more, the fact that he did not have much money in his pocket does not allow the inference that he intended to commit a theft inside the house.
*Gear*, 2010 WL 1899645 at *4 n.6.

[20] *Solis*, 589 S.W.2d at 447, see note 14 *supra*.

[21] *Gear*, 2010 WL 1899645 at *5.