**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00284-CR**
_____

**RUTILIO GODINES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-39524**

_____

**MEMORANDUM OPINION**

A jury found Appellant Rutilio Godines guilty of burglary of a habitation, a second-degree felony, and sentenced him to six years in prison. *See* Tex. Penal Code Ann. § 30.02. In two issues, Godines complains that the trial court erred by not conducting a competency hearing during his trial testimony, and he challenges the sufficiency of the evidence that he intentionally entered a habitation to commit assault. As more fully explained below, we affirm.

1

# BACKGROUND

In March 2022, the 911 dispatcher received a call wherein the caller, later identified as Nichole Perez, reported that someone had broken into her home. Perez and her children hid in the bedroom closet while the intruder was in her home.

The trial evidence showed that on March 11, 2022, Perez was at her home in Winnie, Texas with her two children. Perez was on the phone with her husband, who was out of town, when she heard scratching noises and saw someone running back and forth between her car and the front door on her surveillance cameras. Perez testified that someone then began banging, pounding, and yelling at her front door. The person yelled that someone was chasing him and to let him in. Perez responded to the person that she could not help him and that he needed to leave. The person persisted that he needed to be let in, and Perez repeated that she could not help him. Perez testified that she did not recognize the person at her door, so she hung up with her husband and called 911.

Once connected with 911, Perez informed the dispatcher that she saw someone on her cameras banging on her door trying to get Perez to let him inside. Perez testified that she feared for her life and the lives of her children, so she had her kids hide in her bedroom closet. Using a monitor in her bedroom, Perez observed the person, and he continued to beat on her door. He eventually entered her home after breaking a window. Perez had already barricaded herself and her kids in the

2

master bedroom by pushing her dresser in front of the locked door when she heard the window break. Perez was also armed with a gun. Once inside her home, the intruder continued to yell about being let inside and told Perez to "[g]et off of the phone or else[,]" that she would regret this, that he would get her, and he called her expletive names; and she perceived these comments as threats.

Perez testified that she listened to the 911 call and that it was an accurate recording of her phone call to the Jefferson County Sheriff's Office. The 911 call was played in open court to the jury. Perez indicated that at the end of the call, she is heard crying in relief once the police came into her house and the intruder was in custody.

According to Perez, she did not know Godines, but his mother lived across the street from her. Perez saw Godines once when she attended his mother's birthday party. That was the extent of Perez's interaction with Godines, and she was not introduced to him. She did not tell the officers that Godines was her neighbor because he was not her neighbor. Perez stated that Godines' mother is her neighbor.

Perez did not know if Godines normally stayed at his mother's house. Perez identified Godines as the man who broke into her house on March 11, 2022, and she testified that she did not know it was Godines that night. According to Perez, Godines did not have permission to be at her home that night, and despite asking for help initially, once inside her home, Godines threatened Perez and her children with

3

a knife. Perez identified a photo of the interior of her home as it existed on the night of the break-in. Perez also testified there is a knife depicted near the front door in the photo and the knife did not belong to her. Additionally, video from Perez's home cameras admitted at trial showed a male running down her driveway.

Perez testified that her children have struggled with post-traumatic stress disorder since the burglary. According to Perez, her son has nightmares occasionally, and her daughter gets triggered about death and will have a breakdown. Perez stated that she had breakdowns and struggles with feeling safe since this happened, because she believes that Godines was trying to hurt her and her children.

The State called William Crain, a deputy with the Jefferson County Sheriff's Office. On March 11, 2022, Crain was assigned to K9 patrol, and he and his trained police dog were patrolling in the Hamshire area when he was called to Englin Road regarding a burglary in progress with the suspect still at the scene. He recalled that Sergeant Baker and Deputy Woodle also responded to the scene. Baker began giving commands to someone, and once Baker said it was okay, Crain went to the front of the home with his dog. Crain testified that a bottom window near the front door was busted out and furniture was barricaded against the window. Since this was a burglary in progress, this indicated to Crain that a suspect had barricaded himself inside the residence to stop anyone else from getting inside behind him, though he initially saw no one. When he looked through the window the second time, Crain

4

saw someone inside the residence, and he deployed his dog while he gave the person commands through the hole. The person inside complied with the commands, came out the front door, and was taken into custody. Crain identified the person who came out of the house as Godines.

Crain cleared the residence, and dispatch advised Perez to come out. He described Perez as very scared with two small children with her. Crain detailed that he checked nearby residences because Godines kept saying that there was a dead woman and two dead children at another residence. Crain indicated that he eventually learned Godines had been staying across the street at his cousin's home, and officers went to that home to check for dead bodies. Upon contacting the cousin, officers learned that the cousin went to shower and did not know that Godines had left the home. Officers did not locate any dead bodies.

Crain testified that Godines indicated there were dead bodies at a small trailer park off Hwy 124. After checking that location, they found no dead bodies, and no signs of a disturbance. According to Crain, Godines also reported he was being chased or that his family was trying to hurt him. After investigating all Godines's statements, Crain determined that there were no signs that anyone had chased Godines, no signs of a struggle at the home where Godines was staying, and no dead bodies or signs of a struggle in the trailer park that Godines mentioned.

Crain described Godines as "very erratic[,]" "[a]gitated," and he rambled a lot. Crain wore a body camera when responding to Perez's home, and a portion of the body camera video was played in open court.

Crain stated that they located Godines inside Perez's residence, and he did not have permission or consent to be there. Crain further determined that Godines had no reasonable explanation for being in the Perez residence. He also explained that typically if an armed person breaks into someone's residence, the person is going to do some type of violence or harm.

Next, the State called Jefferson County Sheriff's Deputy Veronica Woodle to testify. Woodle was working patrol on March 11, 2022, and she responded to a call on Englin Road. She recalled Deputy Crain and Sergeant Baker also responding to the scene. She testified that upon arriving at the residence, Deputy Crain advised the suspect was standing in the doorway. Woodle helped handcuff the suspect and clear the residence. The homeowner and her children were the only other people in the home.

Woodle acknowledged that she wore a body camera that night, which accurately recorded her response to the scene. Woodle's body camera footage was admitted as evidence and played in open court.

Woodle detailed that the children and Perez were scared when she encountered them. Woodle stated that Sergeant Baker told her to look for a knife in

6

the front room after Godines told someone where it was. She located the knife by the front door, and it was admitted into evidence. Woodle identified State's Exhibit 1 as the knife that she retrieved and took into evidence. Woodle did not know what type of knife it was but agreed that it could cause serious bodily injury or death.

Woodle identified Godines as the person they found inside Perez's residence. Woodle acknowledged taking several photos of Godines at the scene and photos of Perez's home, and the photos were admitted as evidence.

The State next called Sergeant Kent Baker, Jr., to testify. Baker is currently a supervisor in the Jefferson County Marine Division patrolling the waterway. On March 11, 2022, Baker was a supervisor with the Jefferson County Sheriff's Office and assigned to graveyard patrol.

Baker responded to the break-in call on Englin Road at approximately 11:40 p.m. on March 11, 2022. Baker recalled that Deputy Crain arrived at the scene just before him. Baker walked to the rear of the residence to ensure no one was escaping from the rear of the residence. After clearing the rear, he heard Deputy Crain say to get on the ground, and he immediately went to the front to assist Deputy Crain and Officer Woodle take the suspect into custody and place him in a patrol car. Baker remained with the suspect while the other officers cleared the house and later cleared a trailer across the street. Baker identified Godines as the suspect.

Baker indicated that he wore a body camera that night, and it worked properly. The body camera footage was admitted as evidence and played in open court. Baker recalled bringing Godines in front of Perez to ask if he was her neighbor, and he thought she said yes but admittedly could not hear her well on the video. Baker confirmed that Godines stated that people were trying to kill him, but he did not provide a name. Baker also heard Godines say there are dead bodies, and he knew the other officers investigated it. During that time, Baker sat in his patrol car while Godines was in the backseat, and Godines mentioned that he had a knife and that it was located behind the Perez's front door. Baker described the knife as a stainless steel, 5-inch blade, hard survival knife capable of causing serious bodily injury or death. Baker stated that there was no evidence that people were chasing Godines, trying to kill him, or any dead bodies. He had no evidence that Godines was in an altercation. Godines was incoherent and never provided the names of anyone who had been killed or who was trying to kill him.

The State rested its case, and the defense called Maria Godines Rufaldo as its first witness. Rufaldo is Godines's mother. She stated that she knew the Perez family, and they lived across the street from her. She testified that on the evening of March 11, 2022, Godines called her and said someone wanted to kill him. Rufaldo picked Godines up from his house and brought him to her house on Englin Road.

Once at her house, she showered, ate, and took a nap before she went to work. She recalled that Godines was asleep when she left for her job.

Next, Godines was called to testify. Godines recalled that on March 11, 2022, he called his mother because he was being stalked and watched. He explained that he wanted to talk to his mother, and she came and picked him up around 5 p.m. He described that he was trembling because he had seen five people across the street watching and stalking him and feeling like he needed to get away. Once his mother arrived, Godines testified that he told her that he did not want to talk about what was going on and that he wanted to go to her house, which he described as a safe place. He indicated that his mother said no, and he got angry and explained to her that he was sick and starving since he was not working. He explained that he was "a nervous wreck, hungry, sweating, confused, [and] thinking about his next move." He also testified that he saw the people but then did not see them anymore and figured they were hiding. Once at his mother's house, he forgot about making his next move because his mother's house is nice and clean.

After his mother left for work at approximately 8 or 9 p.m., Godines testified that his two roommates arrived in his stepfather's truck. The two roommates, including one named David, were outside with his cousin, Daniel Romero, and when Romero tried to make them leave, they did not. Godines explained that Romero lives

9

with his mother and that David went to jail that night. He claimed that officers restrained David and took him to jail around 10 p.m. that night.

Godines testified that his cousin called the police a second time on the other roommate that was present that night. He explained that he saw people running around his window and trying to open the front door. One individual made it into the home, and Godines hid in a room while the gunman was in the kitchen. Once the gunman left, Godines tucked a knife in his pants, fled from his mother's house through a bedroom window, and ran to the neighbor to ask for help because he thought the gunman might return.

After leaving through the window, Godines ran across the street to the Perez's home. He turned around and saw his sister open the front door to the home from the inside, and he did not know where she came from because there was no one inside the house while he was there.

Once he got to Perez's home, Godines testified that he knocked on the door and asked Perez to call the cops. He stated that Perez was not scared, and he went to hide behind her house when he realized that someone in a red hoodie was already at the back of the house. So, he ran back to the front of the home and knocked again but did not get a response. After contemplating what he should do next, Godines knocked a third time. According to Godines, he was not threatening or cursing at Perez and only asked for help. He stated that Perez stated that she was putting pants

on and to hold on. At this point, Godines stated that the guy in the hoodie started coming towards the front of the house and was next to him, but he then turned around, walked back the other way, and disappeared.

Godines then went to the front of Perez's home for a fourth time. He admitted that he broke a bottom panel of a window, went inside and barricaded the window with chairs because he noticed more people getting closer and closer. Once inside the home, Godines stated that he was looking for a phone when he noticed someone staring at him through the glass door and saying they were going to shoot. He admitted that he had a weapon and then noticed his cousin standing in the front of the door but then walking away. He recalled Perez screaming and running to the back of the home with her cellphone and the house phone. Though this scared him, Godines stated that it helped him because the people who were after him started backing up. Godines denied trying to get into Perez's bedroom and stated that he stayed in the front, barricaded the windows, and waited for the police. The police showed up about ten minutes later. Once they arrived, Godines came out the front door.

On cross-examination, Godines admitted that the home video and police body cameras only showed him running around Perez's home, and no one else was there or chasing him. According to Godines, he may have been chased by a dog since a small dog is on the camera, but he agreed that he never told police or the jury that a

11

dog was chasing him. He thought the police followed the person in the red hoodie to the trailer park. Godines had no response to the State's contention that there was no evidence or reports of any disturbance at his mother's house that night or down the street where he claimed dead bodies were located. According to Godines, when David went to jail that night, he told Godines that he had killed his cousin, Marabell, and her two kids. He stated that David was the person that chased, stalked, and targeted him.

Godines stated that his behavior was not due to him drinking, and that he was clean and sober that day. He further admitted he scared Perez, and she feared for her life and her children's lives. When asked if the jury saw anything that justified his breaking into Perez's home in the middle of the night, Godines testified that his actions did not seem right.

After deliberating, the jury found Godines guilty of burglary of a habitation. In the punishment phase of the trial, the parties did not call any witnesses to testify. After closing statements, the jury sentenced Godines to six years in prison and a fine of $5,000.

In two issues, Godines challenges his conviction. In his first issue, Godines argues that the trial court erred by not conducting a competency hearing prior to Godines's testimony at trial. Next, Godines challenges the sufficiency of the evidence that he intentionally entered into a habitation to commit assault.

12

## ISSUE ONE: COMPETENCY HEARING

**Standard of Review**

The standard of review on appeal is whether the trial court abused its discretion in failing to conduct a competency hearing. *See Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999). A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence. Tex. Code Crim. Proc. Ann. art. 46B.003(b). A defendant is "incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." *Id.* art. 46B.003(a). Relevant evidence to consider

> includes whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

*Morris v. State*, 301 S.W.3d 281, 286 (Tex. 2009) (citing Tex. Code Crim. Proc. Ann. art. 46B.024).

A trial court may sua sponte suggest that a defendant is incompetent. *Id.* art. 46B.004(a). "On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to

13

stand trial." *Id*. art. 46B.004(c). "Evidence suggesting the new need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent." *Id.* art. 46.004(c-1); *Dusenbery v. State*, No. 02-16-00125-CR, 2018 WL 4025078, at *7 (Tex. App.—Fort Worth Aug. 25, 2018, pet. ref'd) (mem. op., not designated for publication). The article 46B.024 factors are:

(1) The capacity of the defendant during criminal proceedings to:
  (A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;
  (B) disclose to counsel pertinent facts, events, and states of mind;
  (C) engage in a reasoned choice of legal strategies and options;
  (D) understand the adversarial nature of criminal proceedings;
  (E) exhibit appropriate courtroom behavior; and
  (F) testify;
(2) as supported by current indications and the defendant's personal history, whether the defendant:
  (A) is a person with mental illness; or
  (B) is a person with an intellectual disability;
(3) whether the identified condition has lasted or is expected to last continuously for at least one year;
(4) the degree of impairment resulting from the mental illness or intellectual disability, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner; and
(5) if the defendant is taking psychoactive or other medication:
  (A) whether the medication is necessary to maintain the defendant's competency; and
  (B) the effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

Tex. Code Crim. Proc. Ann. art. 46B.024.

14

**Analysis**

Before considering the merits, we must first address the State's argument that Godines failed to preserve his first issue for review. Generally, to preserve a complaint for review on appeal, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds for the desired ruling. *See* Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Most complaints are forfeited by failure to comply with Rule 33.1(a). *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). That said, Rule 33.1 "does not apply to rights which are waivable only or to absolute systemic requirement, the violation of which may still be raised for the first time on appeal." *State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009) (citation omitted).

Article 46B.004(c) requires a trial court, on suggestion that the defendant may be incompetent to stand trial, to determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. *See* Tex. Code Crim. Proc. Ann. art. 46B.004(c). The Court of Criminal Appeals has previously stated that "[a] law that puts a duty on the trial court to act *sua sponte*, creates a right that is waivable only. It cannot be a law that is forfeitable by a party's inaction." *Proenza v. State*, 541 S.W.3d 786, 797 (Tex. Crim. App. 2017) (quoting *Mendez*, 138 S.W.3d at 342) (other citation omitted).

15

Accordingly, a complaint that the trial court did not comply with article 46B.004(c) is a waivable-only right, which we conclude Godines did not waive. *See Proenza*, 541 S.W.3d at 797.

In his first issue, Godines stated that many of his responses at trial were unrelated to the questions asked of him and that the trial court should have informally inquired about his competency to proceed outside the jury's presence. Godines acknowledges that he was evaluated for competency before trial.

The record confirms that before trial, Godines filed a Motion for Competency Examination. In the Motion, counsel for Godines stated that Godines does not appear to understand basic concepts necessary to conduct an effective defense; Godines expressed frustration regarding both the factual and legal matters presented to him; and Godines failed to communicate a basic understanding of trial, as well as factual and legal matters presented.

The next day, the trial court granted the Motion for Competency Examination. A month later, the record shows that Godines was evaluated by a medical professional. The physician determined that Godines was competent to stand trial, and that information was provided to the trial court. Thereafter, counsel for Godines expressly represented to the trial judge that there was no other evidence to discuss regarding Godines' competency, and the trial began.

Counsel for Godines provided no evidence that Godines was incompetent to stand trial and there is no evidence in the record that suggests that Godines could not cooperate or consult with his lawyer or understand or participate in the proceedings. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a); *Turner v. State*, 422 S.W.3d 676, 691 (Tex. Crim. App. 2013). We therefore conclude that the trial court did not abuse its discretion by not conducting a further competency inquiry sua sponte. *See McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003). We also note that Godines does not complain about the court's failure to hold a separate trial to determine his competency to stand trial under Tex. Code Crim. Proc. Ann. art. 46B.005.

We overrule Godines's first issue.

## ISSUE TWO: SUFFICIENCY OF THE EVIDENCE

In his second issue, Godines argues that the evidence at trial was insufficient to support the element that he entered Perez's home with the intent to commit assault. According to Godines, although he had a knife on the night of the incident, he argues that he did not use the knife in a threatening manner and never came face to face with Perez. Godines contends that no evidence was presented to the jury that he threatened or by action committed the offense of assault.

**Standard of Review and Applicable Law**

We view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (citations omitted). In our review, we are not to substitute our judgment for that of the jury; instead, the standard of review requires that the jury be allowed to fully exercise its responsibility to fairly resolve any conflicts that may exist in the testimony, to weigh the evidence for and against the accused, and to draw reasonable inferences from the basic facts to reach its ultimate conclusion about the guilt of the defendant. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citations omitted).

A person commits the offense of burglary if, without the consent of the owner, the person enters a habitation with the intent to commit a felony, theft, or an assault. Tex. Penal Code Ann. § 30.02(a)(1). A person acts intentionally or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. A person commits the offense of assault if the person intentionally or knowingly threatens another with imminent bodily injury. *Id.* § 22.01(a)(2).

18

**Analysis**

Although Godines argues that he did not use the knife in a threatening manner and did not come face to face with Perez during the incident, each of the facts that a jury considers about a case during trial "need not point directly and independently to the guilt of the appellant, as long the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citations omitted). On appeal, whether the jury's inferences were reasonable in finding a defendant was guilty is determined based on "'the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 16–17).

Here, the evidence showed that Godines entered Perez's home at night by breaking a window located near her front door. The jury heard Perez's emergency call to 911 and her testimony wherein she stated that she saw a person running around her property and that the person began banging, pounding and yelling on her front door. Perez indicated that she feared for her life and the lives of her small children and that she barricaded them in the master bedroom for their safety. Perez further testified that once inside her home, Godines yelled about being let inside, that he told Perez to get off the phone, told her that she would regret this, told her that he would get her, and called her expletive names that she perceived as threats.

19

The jury also heard Godines's testimony where he admitted that he entered Perez's home with a knife, that he scared Perez and that she feared for her life and her children's lives. Based on a review of the entire record, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, including that he entered Perez's home to commit a felony, theft, or an assault. *See Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 16–17; *LaPoint v. State*, 750 S.W.2d 180, 182 (Tex. Crim. App. 1986). Accordingly, we hold that the evidence is sufficient to support the jury's verdict.

We overrule Godines's second issue.

## CONCLUSION

Having overruled both of Godines's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 20, 2025
Opinion Delivered September 24, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

20